**Walter Woodburn EUBANKS, Appellant,**

**v.**

**James H. BILLINGTON, Appellee.**

**Tommy SHAW, Appellant,**

**v.**

**James H. BILLINGTON, Appellee.**

**Nos. 95–5336, 95–5387.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 4, 1997.

Decided April 11, 1997

Jeanne Goldberg, Alexandria, VA, and Alan D. Strasser, Washington, DC, argued the cause for appellants, with whom Victor M. Glasberg and Stephen R. Smith were on the briefs.

Madelyn E. Johnson, Assistant U.S. Attorney, Washington, DC, argued the cause for appellee Billington, with whom Eric H. Holder, Jr., U.S. Attorney, R. Craig Lawrence and John O. Birch, Assistant U.S. Attorneys, were on the brief.

Marc L. Fleischaker, David L. Kelleher and Joseph M. Sellers, Washington, DC, were on the brief for appellees Howard R.L. Cook, et al. David E. Mills entered an appearance.

Before: EDWARDS, Chief Judge, HENDERSON and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

Appellants Walter Woodburn Eubanks and Tommy Shaw appeal an order denying their motions to opt out of a settlement agreement in a class action alleging discriminatory employment practices by the Library of Congress. Appellants, who contend that they were denied promotions on account of their race, seek to opt out of the class, which was certified pursuant to FED. R. CIV. P. 23(b)(2), so that they can pursue individual claims that they are entitled to promotions and back pay. They contend that the district court erred as a matter of law in ruling that it lacked discretion to permit opt-outs from the (b)(2) class, and abused its discretion in ruling, alternatively, that appellants had failed to show that they were entitled to opt out. We agree with appellants that the district court erred in ruling it lacked discretion to permit appellants to opt out of the class, but we find no abuse of discretion by the court in denying their motions to do so.

## I.

In 1975, Howard Cook, David Andrews, and the Black Employees of the Library of Congress ("BELC") filed an administrative

complaint with the Library of Congress alleging that it had engaged in discriminatory employment practices in violation of § 717 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16. In 1982, after the Library rejected their administrative complaint, Cook and the BELC filed the instant lawsuit, alleging that the Library systematically discriminated against African American professional and administrative employees in promotion and advancement decisions. After permitting six new employees, including appellant Shaw, to intervene as plaintiffs, the court denied intervention by thirty-one additional employees and they appealed. This court reversed, holding that the thirty-one employees were entitled to intervene as a matter of right. *Cook v. Boorstin,* 763 F.2d 1462, 1471 (D.C.Cir.1985). In remanding the case, this court suggested that the district court reconsider its denial of class certification in light of the large number of employees to be granted intervention as a matter of right. *Id.* at 1471. The court noted that the district court had denied the plaintiffs' request for certification of a class action and instead had created six subclasses to match the facts alleged by the six named plaintiffs, but subsequently decertified all but one subclass, the Shaw 4(a) subclass, which consisted of black employees allegedly not promoted because of the Library's failure to post certain job openings, and did not include any of the *Cook* appellants.[1] *Id.* at 1465.

On remand, while the plaintiffs' renewed motion for class certification was pending, the Library conceded liability as to the Shaw 4(a) subclass, but not as to any individual, non-class claims. The district court enjoined the Library from making new appointments pursuant to § 4(a), assessed monetary damages in the amount of $805,264.01 for front pay and back pay,[2] and awarded $10,000 to appellant Shaw as the subclass representative. The money damages were to be allocated among class members on the basis of individual hearings before a magistrate judge.

Meanwhile, in 1988, the district court certified a class pursuant to FED.R.CIV.P. 23(b)(2) of:

> All past, present, and future black employees at the Library of Congress who possess the minimum objective qualifications necessary to be eligible under valid, nondiscriminatory standards for selection or promotion to any professional or administrative position at the Library of Congress, and who have been, are being, or may in the future be, denied equal employment or promotional opportunities as a result of defendant's discriminatory practices....

On August 14, 1992, the district court granted the plaintiffs' motion for partial summary judgment, ruling that as to the (b)(2) class plaintiffs had made out a prima facie case of both disparate treatment and disparate impact in the competitive promotion process, and that the Library had failed to present any legitimate, nondiscriminatory justification for its employment selection procedure. Thereafter the parties entered into a settlement agreement.

The settlement agreement set new procedures for competitive selections and required non-competitive personnel actions to be

---

1. The name of the subclass refers to § 4(a) of the Library's regulations. Section 2 of Library Regulation 2010–14 provides, in relevant part that "[a]ll vacancies within the Library, except those noted in Section 4 below, shall be posted...." Section 4 provides, in relevant part:

   It is the policy of the Library to keep exceptions to the foregoing to a minimum. Exceptions shall be permitted only in the following cases:
   (a) Positions for which, because of their unusual or special character, the Librarian may determine that the posting of notice of a vacancy is impractical or undesirable. The Librarian will report to the staff contemporaneously on any appointments made under this exception, either in a Special Order or in the Information Bulletin.

2. The award of back pay was intended to compensate the subclass members for lost wages for the period from 1973, two years before the administrative complaint was filed, to 1987, when the Library conceded liability. The award of "front pay" was intended to compensate subclass members for lost wages incurred after the concession of liability, and "for the fact that the wrongs for which they are entitled to receive back pay cannot be righted without delay." *Thompson v. Sawyer,* 678 F.2d 257, 292 (D.C.Cir. 1982).

based on "legitimate, nondiscriminatory job-related criteria." It also called for equal employment opportunity training of Library supervisors, and required the Library to provide plaintiffs' counsel with access to records to monitor compliance. In addition, the settlement agreement required the Library to pay $8.5 million "in full and complete satisfaction of all claims for back pay," and provided that "[t]he payment of this sum shall resolve all claims for monetary relief that are or could have been claimed in actions barred by the preclusive effect of this Agreement as provided in Paragraph 31, except for claims for attorneys' fees, costs, and interest on fees and costs."[3] The settlement included the $805,264.01 previously awarded by the district court to the Shaw 4(a) subclass. Further, the Library agreed to promote 40 class members and to reassign laterally up to 10 class members. All issues of class membership and the allocation or distribution of relief under the agreement were to be decided by a Settlement Committee of up to thirteen class members, subject to review by the district court.[4]

The settlement agreement made no provision for class members to opt out of the settlement to pursue individual claims against the Library. In a separate letter to the Library's counsel, class counsel agreed to refrain from advocating opt-outs to class members, and to advise the court that the settlement was fair and reasonable to the class as a whole. Class counsel also agreed not to advise on the fairness or legality of opting out for individual class members and, if asked by the court, to state that the law appeared to give the court discretion to allow opt-outs in certain circumstances.

Appellant Eubanks, an economist who has a doctoral degree and has worked for the Library since 1984, holds a Senior Level II (GS–16 equivalent) position with the Congressional Research Service Economics Division. On January 7, 1993, he filed an administrative complaint with the Library, see 42 U.S.C. § 2000e–16, alleging that the Library had chosen a new chief of the Economics Division without competitive posting or other notice, in violation of Library regulations and the district court's order enjoining the use of § 4(a). Although the Library investigated the complaint, it took no final action. Eubanks subsequently submitted a claim form in the class action and was notified that he would receive $6,842.32, but no promotion, as his share of the settlement.[5] Eubanks thereafter moved for leave to opt out of the settlement so that he could pursue an individual Title VII claim against the Library.

Appellant Shaw, who has a doctorate in personnel and industrial psychology, has worked for the Library since 1974. In 1980, he filed an administrative complaint alleging that the Library had "systematically exclud-

3. Paragraph 31 provided that:

The terms of this Agreement shall constitute full and complete satisfaction of all claims of Class Members against the defendant concerning racial discrimination in violation of Title VII ..., resulting in non-selection, either competitively or non-competitively, in or into Professional and Administrative positions within the Library that arise out of events occurring up to final District Court approval of the Agreement. Upon Final Court Approval of this Agreement, the class as a whole and each Class Member shall be bound by the doctrines of *res judicata* and collateral estoppel with respect to all such claims.

4. The $8.5 million settlement fund was distributed as follows: First, the Settlement Committee made various payments to class representatives, named plaintiffs, and intervenors, in recognition of the time and energy they contributed to the lawsuit. Included among these payments was the $10,000 previously awarded to appellant

Shaw by the district court. Second, the Committee allocated $805,264.01 to the members of the 4(a) subclass, an amount equal to that previously awarded by the district court, to be distributed according to a formula whereby no class member could receive more than $20,000. Third, of the remaining funds, the Committee allocated one-half to members of the main class who were in professional or administrative positions, and divided the other half between members of the main class who were in professional or administrative positions, and those who were not in such positions, but who believed they would have been if nondiscriminatory standards had been used for promotions; the latter division was proportional to the total number of class members in each group. These funds were allocated among the members of each group according to a formula based upon length of employment and number of competitive promotions received.

5. Eubanks asserts that the Settlement Committee subsequently increased his monetary award to $6,963.84 to remedy a calculation error.

ed" him from consideration for the position of Director of Personnel, selecting a white male instead. Shaw maintains that the Library failed to conduct any competitive selection process, and selected the new Director without posting notice pursuant to § 4(a). In 1981, Shaw filed a second administrative complaint. While these complaints were pending, Shaw intervened in the instant case and was certified as the sole representative of the 4(a) subclass. *See Cook,* 763 F.2d at 1465. Shaw asserts that under the settlement agreement, he would receive $25,791.74, and an increase in salary from the GS–14 to the GS–15 level. He filed an objection to the proposed settlement agreement, alleging that it was "unfair, inadequate and unreasonable" because the promotions and monetary relief for Shaw 4(a) subclass members were not commensurate with their losses as a result of discrimination. He also filed a "motion for a separate hearing on damages," asking the district court to exercise its "discretion to allow Dr. Shaw (or any other Plaintiff, for that matter) to have an individual hearing on the issue of damages, or even to opt out of the settlement entirely and proceed with a full blown hearing on the merits."

The district court denied the motions of four class members, including appellants, to opt out of the settlement agreement. The court ruled that "there is no right to opt out of this class certified pursuant to Fed. R.Civ.P. 23(b)(2) and, alternatively, that, even if such a right existed, the movants have not demonstrated an entitlement to the relief requested...." With respect to appellants' claims that they were uniquely situated, the court found that:

> None of the movants has demonstrated a right to relief or presented circumstances that so distinguish his or her claims from those of the main class that would permit him or her to opt out. Indeed, this action is one in which "the party opposing the class has acted or refused to act on grounds generally applicable to the class." Fed.R.Civ.P. 23(b)(2). This is not a case in which individual class members have alleged or demonstrated that they have suffered in any unique way, necessitating that the right to opt out be provided when the parties have failed to establish it in their agreement.... [T]he movants have failed to show special circumstances requiring that they be permitted to opt out.

The district court subsequently approved the settlement agreement. Appellants appeal the order denying their motions to opt out, but not the order approving the settlement agreement.

## II.

The 1966 amendments to Rule 23(b) of the Federal Rules of Civil Procedure created three distinct categories of class actions that may be maintained: the (b)(1) action, the (b)(2) action, and the (b)(3) action.[6] The three categories are not mutually exclusive, and a class may be certified under more than one category. 3B JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 23.31[2], at 23–

---

**6.** All proposed classes must satisfy the prerequisites of Rule 23(a): that the class is so numerous as to make joinder impracticable, that there are questions of law or fact common to the class, that the claims or defenses of the representative parties typify those of the class, and that the representative parties will fairly and adequately protect the interests of the class. Rule 23(b) provides, in relevant part:

> An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy....

235 (2d ed.1996); 1 HERBERT NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 4.01, at 4–4 to 4–5 (3d ed.1992). However, there are important procedural distinctions between the (b)(1) and (b)(2) actions and the (b)(3) action. Rule 23(c)(2) provides that all class members in a (b)(3) action are entitled to notice and an opportunity to exclude themselves from the class and the preclusive effect of any judgment by "opting out" of the lawsuit.[7] The rule has no comparable provision for (b)(1) and (b)(2) classes.

Title VII and other civil rights class actions are frequently certified pursuant to Rule 23(b)(2). *See generally* 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1776 (1986); *see also* FED.R.CIV.P. 23 advisory committee's note (1966). Although the defining characteristic of the (b)(2) class is that it seeks declaratory or injunctive relief applicable to the class as a whole, it is not uncommon in employment discrimination cases for the class also to seek monetary relief in the form of back pay or front pay. Courts have generally permitted (b)(2) classes to recover monetary relief in addition to declaratory or injunctive relief, at least where the monetary relief does not predominate. *See Probe v. State Teachers' Retirement System,* 780 F.2d 776, 780 (9th Cir.), *cert. denied,* 476 U.S. 1170, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986); *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1152 (11th Cir.1983); *Alexander v. Aero Lodge No. 735,* 565 F.2d 1364, 1372 (6th Cir.1977), *cert. denied,* 436 U.S. 946, 98 S.Ct. 2849, 56 L.Ed.2d 787 (1978) WRIGHT ET AL., *supra,* § 1775, at 463–67; MOORE ET AL., *supra,* ¶ 23.40[4], at 23–278; NEWBERG & CONTE, *supra,* § 4.14, at 4–48 to 4–49.

Appellants do not contend that the instant lawsuit was improperly certified as a (b)(2)

class action but only that the district court erred in not permitting them to opt out of the class action so they could pursue individual claims for monetary relief. Relying on *Luevano v. Campbell,* 93 F.R.D. 68, 85–86 (D.D.C.1981), the Library responds that because the class was certified pursuant to Rule 23(b)(2) and the settlement agreement did not provide for opt-outs, appellants had no opt-out right. In effect, the Library contends that the district court lacked discretion to permit opt-outs. The Library responds, alternatively, that even if the district court had discretion to grant appellant's motions to opt out, the court did not abuse its discretion in denying the motions.

The availability of opt-out rights in (b)(1) and (b)(2) class actions is an unsettled question in this circuit.[8] A number of courts have held that, as a general matter, due process does not require that (b)(1) or (b)(2) class members be given an opportunity to opt out. *See, e.g., In re Asbestos Litigation,* 90 F.3d 963, 986–87 (5th Cir.1996), *reh'g denied,* 101 F.3d 368 (5th Cir.1996), *petition for cert. filed,* (March 3, 1997) (No.96–1394) ((b)(1)(B) actions); *Dosier v. Miami Valley Broadcasting Corp.,* 656 F.2d 1295, 1299 (9th Cir.1981) ((b)(2) actions); *Laskey v. United Auto. Workers,* 638 F.2d 954, 957 (6th Cir.1981) ((b)(2) actions); *Robertson v. National Basketball Ass'n,* 556 F.2d 682, 685–86 (2d Cir. 1977) ((b)(1)(B) actions). *But see Brown v. Ticor Title Ins. Co.,* 982 F.2d 386 (9th Cir. 1992), *cert. dismissed,* 511 U.S. 117, 114 S.Ct. 1359, 128 L.Ed.2d 33 (1994). Professors Wright and Moore suggest in their treatises that where a lawsuit meets the requirements for certification under either (b)(1) or (b)(2) as well as (b)(3), a court should order that the case be certified under (b)(1) or (b)(2), thereby avoiding the often burdensome and costly notice requirements applicable to (b)(3) classes. WRIGHT, *supra,* §§ 1772, 1775,

---

7.  Rule 23(c)(2) provides:

    In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude the member from the class if the member so requests by a specified date; (B) the

judgment, whether favorable or not, will include all members who do not request exclusion; and (c) any member who does not request exclusion may, if the member desires, enter an appearance through counsel.

8.  *But see Larionoff v. United States,* 533 F.2d 1167, 1182 n. 37 (D.C.Cir.1976) (dictum), *aff'd* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977).

at 425–26, 491–92; MOORE ET AL., *supra*, ¶ 23.31[3], at 23–236; *but see also id.* ¶ 23.40[4]. A number of courts have adopted this view. *See In re A.H. Robins Co.*, 880 F.2d 709, 728 (4th Cir.1989), *cert. denied sub nom. Anderson v. Aetna Cas. Sur. Co.*; 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989); *First Federal of Michigan v. Barrow*, 878 F.2d 912, 919 (6th Cir.1989); *Kyriazi v. Western Elec. Co.*, 647 F.2d 388, 393 (3d Cir.1981); *Laskey*, 638 F.2d at 956; *Reynolds v. National Football League*, 584 F.2d 280, 284 (8th Cir.1978); *Robertson*, 556 F.2d at 685.

The rigidity of this position has not escaped criticism, however. For, as one commentator has noted, "[a]s has become increasingly apparent since 1966, these amendments created an awkward mismatch between the subdivisions under which class actions are certified and the procedural protections to which a class is entitled." George Rutherglen, *Better Late Than Never: Notice and Opt Out at the Settlement Stage of Class Actions*, 71 N.Y.U. L.REV. 258, 260 (1996). This commentator has observed that "[t]he Advisory Committee foresaw neither the surge in filings of Title VII class actions nor decisions that award individual compensatory relief based on findings of classwide discrimination." George Rutherglen, *Notice, Scope and Preclusion in Title VII Class Actions*, 69 VA. L.REV. 11, 25 (1983).[9] Consequently, this commentator concludes, the Advisory Committee did not address the need for notice in Title VII class actions seeking compensatory as well as injunctive relief. *Id.; see also* WRIGHT, *supra*, § 1776, at 495. The Advisory Committee's lack of foresight in this regard may also explain Rule 23's failure to address the possible need for opt-out rights in non-(b)(3) actions. Several commentators have suggested that, despite the absence of any such requirement in Rule 23, where class members seek individual compensatory relief in addition to broad classwide injunctive relief, it is appropriate for a court to afford them the procedural protections of notice and an opportunity to opt out. NEWBERG & CONTE, *supra*, § 4.14, at 4–51 to 4–52; Rutherglen, *Notice and Opt–Out, supra*, 71 N.Y.U. L. REV. at 274.[10]

Although the cases permitting opt-outs in (b)(1) and (b)(2) actions are few, *see, e.g., County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295 (2d Cir.1990); *Holmes*, 706 F.2d 1144, a number of circuits recognize that district courts have discretion to permit them. *See Crawford v. Honig*, 37 F.3d 485, 487 n. 2 (9th Cir.1995); *Williams v. Burlington Northern, Inc.*, 832 F.2d 100, 103 (7th Cir.1987), *cert. denied*, 485 U.S. 991, 108 S.Ct. 1298, 99 L.Ed.2d 508 (1988); *Penson v. Terminal Transport Co.*, 634 F.2d 989, 994 (5th Cir.1981). In *Suffolk*, the Second Circuit found no abuse of discretion in permitting an opt-out right in a (b)(1)(B) "limited fund" class action. 907 F.2d at 1305. Suffolk County and ratepayers of an electric utility had filed a RICO action against the utility and its officers. Initially, the district court denied a motion for class certification, and tried Suffolk's claim before a jury, thereafter granting judgment for the defendants despite a verdict in Suffolk's favor. *Id.* at 1300–01. Subsequently, the court certified a class pursuant to Rule 23(b)(1)(B), but allowed Suffolk to opt out of the class so that it could appeal the court's decision to set aside the jury verdict. *Id.* at 1302. The Second Circuit rejected the utility's contention that the district court lacked discretion to permit Suffolk to opt out. *Id.* at 1305. Focusing on Rule 23(d),[11] the court held that "a district

9. Title VII cases seeking individual monetary damages as well as classwide injunctive relief may be equally amenable to certification as (b)(3) actions, and "the arguments supporting certification exclusively under subdivision (b)(2) are surprisingly weak." Rutherglen, *Notice, Scope and Preclusion, supra*, 69 VA. L.REV. at 24. To the extent that the preference for (b)(2) certification reflects concern about the burden of the mandatory notice requirements applicable under (b)(3), *see* MOORE ET AL., *supra*, ¶ 23.31[3], at 23–237, that concern is somewhat less pressing where, as in the instant case, individual notice will ultimately be required to distribute the settlement fund.

10. *See also* Gerald E. Rosen, *Title VII Classes and Due Process: To (b)(2) or Not to (b)(2)*, 26 WAYNE L.REV. 919, 951–54 (1980).

11. Rule 23(d) provides, in pertinent part, that the district court:

may make appropriate orders ... (2) requiring, for the protection of the members of the

court, in a proper case and in the exercise of sound discretion, may allow a class member to opt out of a limited fund class action under Rule 23(b)(1)(B) in order to facilitate 'the fair and efficient conduct of the action.' " *Id.* at 1304–05 (quoting FED.R.CIV.P. 23 advisory committee's note (1966)). Under the somewhat unusual facts of *Suffolk*, the Second Circuit found no abuse of discretion by the district court inasmuch as "basic fairness" supported the court's conclusion because Suffolk, having already litigated its claims before a jury at great expense, and obtained a favorable jury verdict, was in a different position than other class members. *Id.* at 1305. Because the jury verdict placed a ceiling on Suffolk's potential recovery, moreover, permitting the county to opt out could not jeopardize the interests of the class. Thus, the opt-out did not under-mine the fundamental basis for certification of a (b)(1)(B) class action: that recovery by some class members might effectively preclude other class members from recovery. *See id.* at 1304. The court concluded that "[c]ombined, these two determinations provided a strong basis for permitting Suffolk to opt out." *Id.* at 1305.

The Eleventh Circuit concluded that the district court abused its discretion in not permitting opt-out rights in *Holmes*, 706 F.2d 1144. Like the instant case, *Holmes* was an employment discrimination class action certified under Rule 23(b)(2), in which the class sought monetary damages as well as injunctive relief. Prior to class certification, the parties entered into a settlement agreement, providing for a $43,775 lump sum back pay award. *Id.* at 1146. Under the distribution formula adopted by the class representatives, the eight named plaintiffs were to receive approximately one-half of the award, with the other half divided between the remaining 118 class members. The district court certified the class and approved the settlement agreement over the objection of thirty-nine class members. *Id.* at 1146–47. The Eleventh Circuit determined that the

record was insufficient to justify the allocation of half of the back pay award to the named plaintiffs, and that the district court abused its discretion by not allowing class members to opt out. *Id.* at 1148–52. Acknowledging that absent class members have no "automatic right" to opt out of a (b)(2) class action, *id.* at 1153, the court opined that "a district court may mandate such a right pursuant to its discretionary power under Rule 23." *Id.* at 1154 (quoting *Penson*, 634 F.2d at 993). Where (b)(2) class members seek monetary relief as well as damages, the court observed, conflicts of interest may emerge, and the assumptions of homogeneity and class cohesiveness that underlie (b)(2) certification can begin to break down. *Id.* at 1155. In particular, when a Title VII class action reaches the monetary relief stage, it may begin to resemble a (b)(3) action. Agreeing that "the assumption of monetary relief class cohesiveness may be justified in many Title VII actions brought under subsection (b)(2)," the court reasoned that it was not justified in *Holmes* because the merits of the back pay claims were "uniquely individual to each class member." *Id.* at 1159. Consequently, "the right to opt out of the class, normally accorded only to (b)(3) class members, must be extended to all members of this (b)(2) class," and the district court's failure to allow opt-outs was an abuse of discretion. *Id.* at 1160.

We join those circuits holding that the language of Rule 23 is sufficiently flexible to afford district courts discretion to grant opt-out rights in (b)(1) and (b)(2) class actions. The rule itself does not expressly preclude opt-outs in non-(b)(3) actions, and the procedural flexibility suggested in subsection (d) is consistent with the view of Professor Moore that within the basic framework of Rule 23, "the supportable range of judicial choice appears quite wide." MOORE ET AL., *supra*, ¶ 23.40[4], at 23–283. Although, as a general matter, courts should not permit opt-outs when doing so would undermine the policies behind (b)(1) or (b)(2)

---

class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the

opportunity of members to signify whether they consider the representation fair and adequate ... [or] (5) dealing with similar procedural matters....

certification, where both injunctive and monetary relief are sought, the need to protect the rights of individual class members may necessitate procedural protections beyond those ordinarily provided under (b)(1) and (b)(2). As the Eleventh Circuit observed in *Holmes*, 706 F.2d at 1156–57, the underlying premise of (b)(2) certification—that the class members suffer from a common injury that can be addressed by classwide relief—begins to break down when the class seeks to recover back pay or other forms of monetary damages to be allocated based on individual injuries. In that situation, an employment discrimination case will implicate the concerns that led to the adoption of more stringent procedural protections in (b)(3) actions, and the potential for conflicts of interest may necessitate measures, such as permitting opt-outs, that safeguard the due process rights of individual class members. *Id.* at 1154–57; *Penson*, 634 F.2d at 994. That back pay is characterized as a form of "equitable relief" in Title VII cases, *see Sparrow v. Commissioner of Internal Revenue*, 949 F.2d 434, 438 (D.C.Cir.), *cert. denied*, 505 U.S. 1211, 112 S.Ct. 3009, 120 L.Ed.2d 883 (1992), does not undercut the fact that variations in individual class members' monetary claims may lead to divergences of interest that make unitary representation of a class problematic in the damages phase. *See* Rutherglen, *Notice, Scope, and Preclusion, supra,* 69 Va. L.Rev. at 25–26.

The government has expressed concern that under a flexible approach class members with individual monetary claims found to merit additional procedural protection would routinely opt out of class-wide settlements, and "defendants would not be inclined to settle where the result would likely be a settlement applicable only to class members with questionable claims, with those having stronger claims opting out to pursue their individual claims separately." *Kincade v. General Tire & Rubber Co.,* 635 F.2d 501, 507 (5th Cir.1981). Mindful that in the Title VII context as elsewhere public policy favors settlement of claims, we do not treat this concern lightly. *Cf. Patterson v. McLean Credit Union,* 491 U.S. 164, 180–81, 109 S.Ct. 2363, 2374–75, 105 L.Ed.2d 132 (1989); 42 U.S.C. § 2000e–5(b). Yet, while the availability of opt-out rights may influence litigants' assessment of appropriate terms for settlement, there is no reason to believe that it will always weaken the incentive to settle. For example, the parties might commit themselves to a settlement agreement that includes an adjustment in the total dollar amount depending on the number of opt-outs.[12] Where there are clear disparities in the nature or magnitude of the relief sought by individual class members that might inhibit settlement, the district court can evaluate not only whether injunctive or monetary claims predominate, but which type of class certification, or a "hybrid," would best accommodate needed protection for individuals and the opportunity for settlement. To minimize the government's concern that permitting opt-outs in (b)(2) class actions will impede settlement, the district court also could address the question of opt-outs early in the litigation so that any settlement discussions would proceed with an understanding of who would be bound and could avoid disruption due to opt-outs. Where the parties negotiate a class settlement on the assumption that it will be mandatory and binding on all class members, a court cannot permit members to opt out without giving the parties an opportunity to renegotiate the settlement.[13] *See Holmes,* 706 F.2d at 1161. By giving early notice, and requiring individual class members to make known their intentions to opt out, the district

---

12. The Library is committed to the settlement agreement regardless of whether appellants are permitted to opt out. In a motion filed in this court on October 16, 1996, seeking issuance of a separate judgment and mandate so that implementation of the settlement agreement could proceed notwithstanding the pendency of the instant appeals, the plaintiff class stated that the Library had consented to the relief requested, and authorized counsel to make known to the court its position that resolution of the opt-out issue would not affect the settlement agreement as a whole. At oral argument, the Library did not take issue with this representation. Only four members of the class sought to opt out.

13. This problem did not arise in *Suffolk* because the court notified the parties that Suffolk would be permitted to opt out when it certified the class. 907 F.2d at 1301.

court would further minimize the possibility that settlements would have to be reopened.

█ With these considerations in mind, we conclude that when a (b)(2) class seeks monetary as well as injunctive or declaratory relief the district court may exercise discretion in at least two ways.[14] The court may conclude that the assumption of cohesiveness for purposes of injunctive relief that justifies certification as a (b)(2) class is unjustified as to claims that individual class members may have for monetary damages. In such a case, the court may adopt a "hybrid" approach, certifying a (b)(2) class as to the claims for declaratory or injunctive relief, and a (b)(3) class as to the claims for monetary relief, effectively granting (b)(3) protections including the right to opt out to class members at the monetary relief stage. See Holmes, 706 F.2d at 1154–60; NEWBERG & CONTE, supra, § 4.14, at 4–51 to 4–52; Rutherglen, Notice, Scope, and Preclusion, supra, 69 VA L.REV. at 30. Alternatively, the court may conclude that the claims of particular class members are unique or sufficiently distinct from the claims of the class as a whole, and that opt-outs should be permitted on a selective basis. Like the Second Circuit, we view Rule 23(d)(5) to be broad enough to permit the court to allow individual class members to opt out of a (b)(1) or (b)(2) class when necessary to facilitate the fair and efficient conduct of the litigation. See Suffolk, 907 F.2d at 1304.

### III.

█ The question remains whether the district court abused its discretion in denying appellants' motions to opt out. This means, simply, whether the denial fell within the range of permissible alternatives available to the district court, not whether this court might have decided the motions differently. See generally Kickapoo Tribe v. Babbitt, 43 F.3d 1491, 1497 (D.C.Cir.1995). Because the plaintiffs did not seek certification as either a (b)(3) or a "hybrid" class, the court has no occasion to address whether the district court should have extended full (b)(3) protections to all (b)(2) class members.[15] Ever since this court suggested in Cook, 763 F.2d at 1471–72, that the district court reconsider the issue of class certification, the plaintiffs have treated this as a (b)(2) action. Thus, our inquiry focuses solely on whether the district court abused its discretion by denying appellants an opportunity to opt out. As our analysis in Part II indicates, the relevant question for the district court was whether

---

**14.** Newberg and Conte suggest that a district court may provide opt-out rights to a (b)(2) class in four different ways:

> First, ... the court could limit the Rule 23(b)(2) certification to certain issues only. Second, the court could certify the injunction claims under Rule 23(b)(2) and the damages claims under Rule 23(b)(3). Third, the court could certify the entire class initially under Rule 23(b)(2), bifurcate the trial so that the defendant's liability potentially for both forms of relief is determined initially, and reconsider the class certification category if the plaintiffs and the class are successful at the liability stage. Finally, the court could certify special claims or issues under Rule 23(b)(2) and treat all the nondesignated claims or issues as individual or incidental ones to be determined separately after liability to the class has been adjudicated.

NEWBERG & CONTE, supra, § 4.14, at 4–51 to 4–52. For our purposes here, we need not analyze the distinctions between these approaches.

**15.** We note that the district court afforded all class members substantial procedural protections. The settlement agreement provided that prior to its final approval, individual notice of the proposed settlement would be mailed to all potential class members of which the Library was aware or who could reasonably be identified. In addition, notice would be published in area newspapers and publications of the Library of Congress. Individuals who submitted claim forms received follow-up notices, advising them of the Settlement Committee's determination of the relief they were entitled to receive, and that they could contest any aspect of the award at a "fairness hearing" before the district court prior to the court's final approval of the settlement agreement. Of course, as we understand their argument, appellants seek to be compensated independently of the settlement fund, rather than simply to claim a larger share of that fund. Although the procedural protections they received may not have been precisely equivalent to the rights accorded to (b)(3) class members, appellants point to nothing that would indicate that they did not have a meaningful opportunity to present the merits of their individual claims. See Williams, 832 F.2d at 104. Hence, the court has no occasion to parse more finely the minimal procedural rights that must be afforded to a (b)(2) class member seeking permission to opt out.

permitting the opt-out was necessary to "facilitate the fair and efficient conduct of the action." [16] *Suffolk*, 907 F.2d at 1305.

Eubanks' primary contention is that "basic fairness" requires that he be permitted to opt out of the lawsuit because he is "uniquely situated" relative to the rest of the class. He is unique, he maintains, because he filed a timely administrative complaint in 1993 to challenge the Library's denial of a promotion on December 21, 1992, more than four months after the district court entered partial summary judgment against the Library. Although the Library completed its investigation of his complaint by mid-November 1993, it never took final action on the complaint. Consequently, Eubanks contends, the Library deliberately left his claim in "procedural limbo" so that it would ultimately be barred by the class action settlement.

Had Eubanks pursued a separate lawsuit against the Library, his situation would present similarities to *Suffolk*, 907 F.2d at 1302–05, where the district court permitted Suffolk to opt out because it had already litigated an individual action at great expense. The procedural posture of the instant case is significantly different: Eubanks has no favorable jury verdict to defend, nor, so far as the record shows, has he taken any steps or expended any resources to pursue an individual lawsuit, apart from the necessary first step of filing an administrative complaint. Even if, as Eubanks contends, the Library deliberately refrained from acting on his complaint, he could have filed an employment discrimination lawsuit in federal court at any time after 180 days from the filing of his administrative complaint on January 7, 1993. 42 U.S.C. § 2000e–16(c); *see Wilson v. Pena*, 79 F.3d 154, 166 (D.C.Cir.1996). Having failed to avail himself of a statutory remedy for persons "aggrieved ... by the failure [of an employer] to take final action on his complaint," 42 U.S.C. § 2000e–16(c), Eubanks' contention that basic fairness requires that he be permitted to opt out rings hollow.

Shaw contends that "basic fairness" dictates that he should be permitted to opt out because the district court and class counsel had previously represented that he would receive a "separate hearing" on his individual damages. In 1988, after the Library conceded liability with respect to the Shaw 4(a) subclass, the district court awarded front and back pay, with the funds to be distributed after individual hearings before a magistrate judge. While noting in its order that Shaw had asserted that he was entitled to lost wages of $110,000 and fringe benefits as a result of being denied promotion to the position of Director of Personnel, the court ruled that it "need not resolve this dispute at present, as Dr. Shaw may litigate his back pay claim along with the other class members before the Magistrate."

We do not interpret the district court's order as a promise that Shaw would be allowed to pursue his individual claim separately from the other class members. Rather, the district court treated Shaw like the other members of the Shaw 4(a) subclass, allowing him to present an individualized claim for a share of the settlement fund to the magistrate judge. Nor, more importantly, can Shaw plausibly claim prejudice from the fact that the district court never implemented these procedures. Although the district court's back and front pay awards to the Shaw 4(a) subclass were subsumed in the settlement, the Settlement Committee awarded $805,264.01 of the $8.5 million settlement to Shaw 4(a) subclass members, an amount equivalent to the back and front pay awards ordered by the court. In addition, the Settlement Committee awarded Shaw the $10,000 he was entitled to receive as the subclass representative. Although the magistrate judge never conducted individualized hearings, Shaw had an opportunity to file an individual claim with the Settlement Committee, and to challenge the Committee's determination at the fairness hearing before the district court. In due process terms, this procedure was equivalent to the "individualized hearings" that the court had previously

---

**16.** Because appellants have not raised the issue, the court has no occasion to decide whether opt-out rights in (b)(2) actions may ever be required under the Due Process Clause of the Constitution. *See Ticor Title Ins. Co. v. Brown*, 511 U.S. 117, 114 S.Ct. 1359, 128 L.Ed.2d 33 (1994) (dismissing writ of certiorari as improvidently granted).

contemplated. *See A.H. Robins,* 880 F.2d at 745.

To the extent that Shaw contends that he is entitled not only to an individual hearing on damages, but also to opt out and recover damages from outside the $8.5 million settlement fund, his argument, like Eubanks', would be stronger had he taken any steps between 1980 and 1995 to prosecute his individual claim. Instead, Shaw chose to wait while the class action proceeded. Indeed, Shaw's request that the district court now treat his claim as "distinguished" from those of the other class members is somewhat ironic in view of his service as the sole representative of the 4(a) subclass. The district court, in certifying the subclass, was required to find that Shaw's claims were typical of the claims of the subclass members. FED. R.CIV.P. 23(a). Nothing prevented Shaw from pursuing an individual lawsuit during the past seventeen years, and yet he chose to treat his claim as part of the class claim.

This is not to suggest that filing an individual lawsuit is a necessary prerequisite to preserving opt-out rights that may be available under subdivisions (b)(1) or (b)(2). Rather, our discussion must be read in the context of whether fairness concerns in favor of allowing appellants to opt out outweighed concern about the efficient conduct of the lawsuit. *Suffolk* is one example in which the balance weighed in favor of opt-outs, based on the fact that one member of the class had litigated an individual suit at great expense and that there was no potential prejudice to the prospects for classwide recovery. 907 F.2d at 1305. Another situation might be presented, as in *Holmes,* where the monetary claims of the class members were insufficiently cohesive to warrant collective treatment. 706 F.2d at 1160. Although the range of fairness considerations that may enter into a determination of whether opt-out rights are required may be broad, none of appellants' contentions demonstrates such an entitlement.

Insofar as appellants' uniqueness claims are concerned, they have not shown that the district court failed to give sufficient consideration to the fact that they were among the highest ranking members of the main class, in Eubanks' case, and of both the main class and the 4(a) subclass, in Shaw's case. Essentially, as two of the few high ranking African American employees of the Library, they contend that their opportunities for promotion are much more limited than those of other class members, and that the damages they suffered as a result of not being appointed to the positions for which they were qualified are correspondingly greater. Accepting their assertions as true, however, does not demonstrate an abuse of discretion by the district court in denying them permission to opt out. Under the distribution formula in the settlement agreement, class members who were in professional or administrative positions received a greater share of the settlement funds than class members who were not in such positions. Neither Eubanks nor Shaw appealed the district court's order determining that this distribution represented a fair allocation of the funds. While appellants cite statistics showing that the number of African Americans employed or applying for positions at their level is minuscule in comparison to the numbers at lower levels, they offer no data to suggest that the relief they received under the settlement agreement was unfair in comparison to the relief received by other class members.[17] That both appellants received less under the settlement agreement than they might have expected to receive had they prevailed in individual lawsuits cannot alone justify an opt-out, as no party can reasonably expect to receive in a settlement precisely what it would receive if it prevailed on the merits. *See EEOC v. Hiram Walker & Sons, Inc.,* 768 F.2d 884, 889 (7th Cir.1985), *cert. denied,* 478 U.S. 1004, 106 S.Ct. 3293, 92 L.Ed.2d 709 (1986). To the extent that appellants claim that the settlement is unfair or that class counsel did not adequately represent their interests in negotiating the settle-

---

17. The statistics cited by appellants indicate that of 10,872 African American applicants to the Library from 1979 through 1988, less than 300 (289) were for positions higher than the GS–13 level. Similarly, of the 4,783 employees of the Library who applied for promotion during that period, only 83 applicants sought positions above the GS–13 level.

ment, any remedies they may have lie elsewhere.

Accordingly, given the plaintiffs' consistent position that the lawsuit was properly certified as a (b)(2) class action, we conclude, in light of the opportunities afforded to appellants to present evidence and upon review of that evidence, that the district court did not abuse its discretion in concluding that they failed to show that "basic fairness" required that they be permitted to opt out of the settlement agreement, and we affirm the denial of their motions to opt out of the class settlement.