In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-2216

PHYLLIS JOHNSON, *et al.*,
    on behalf of themselves and
    all others similarly situated,

*Plaintiffs-Appellees*,

*v.*

MERITER HEALTH SERVICES
    EMPLOYEE RETIREMENT PLAN and
    MERITER HEALTH SERVICES, INC.,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 3:10-cv-00426-wmc—**William M. Conley**, *Chief Judge*.

ARGUED OCTOBER 24, 2012—DECIDED DECEMBER 4, 2012

Before POSNER, WOOD, and TINDER, *Circuit Judges*.

POSNER, *Circuit Judge*.  The district court certified this ERISA suit as a class action, and we granted the petition of the defendants (the plan and its administrator, which we'll refer to jointly as Meriter) to appeal the

certification. Fed. R. Civ. P. 23(f). The original plaintiff in whose name the suit was filed was dismissed as a plaintiff on the ground that she was not an adequate class representative, Fed. R. Civ. P. 23(a)(4), because of defenses against her that are inapplicable to other members of the class. Yet remarkably, though she was dismissed before the petition to appeal was filed, the briefs continue to list her as a plaintiff—indeed as the only plaintiff. So we have substituted one of the other named plaintiffs. The briefs also manage to avoid describing Meriter's plan, forcing us to dig deep into the record to discover what the parties are quarreling over. This is a recurrent problem: specialized lawyers' failing to appreciate generalist judges' often limited understanding of esoteric financial instruments. See *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund v. CPC Logistics, Inc.*, No. 11-3034, 2012 WL 3554446, at *3-6 (7th Cir. Aug. 20, 2012).

The class consists of more than 4000 participants in the Meriter pension plan who allegedly were not credited with all the benefits to which the plan entitled them. Some of the class members received benefits (claimed to be inadequate) 23 years ago. Some are current, the rest former, participants in the plan. And the plan has been amended a number of times over the last 23 years. As a result of all this variation in the situation of individual class members, their claims have been divided into 10 groups, each of which the district court has certified as a separate subclass having a different class representative. Each subclass was certified under Fed. R. Civ. P. 23(b)(2), which authorizes class

action treatment if the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Each subclass seeks a declaration of the rights of its members under the plan and an injunction directing that the plan's records be reformed to reflect those rights. Meriter challenges the propriety of certification of the subclasses under section (b)(2) of the class action rule.

The plan is a defined benefit plan, which as the name implies specifies the pension benefits to which a participant is entitled, rather than a defined contribution plan, in which the pension benefit is a fully funded retirement account of the participant. Meriter's plan resembles a type of defined benefit plan known as a cash balance plan. See *Berger v. Xerox Corp. Retirement Income Guarantee Plan*, 338 F.3d 755, 757-58 (7th Cir. 2003). The plan entitles the participant, upon reaching normal retirement age (65), to receive a pension benefit that he can take either as an annuity (annual payment until death, with nothing left over for heirs) or in a lump sum of equivalent value. The amount of the benefit is based on a specified percentage of the employee's salary each year (called the yearly accrual) plus annual interest (called the index rate) on that amount. Meriter calculates the lump sum by multiplying the yearly annuity payment to which the participant would be entitled by 8 (called the lump sum factor).

Each year Meriter reports to every participant the total amount of benefits that the participant has accrued

to date. It calculates those benefits by multiplying the yearly accruals with which the participant has already been credited, plus the accumulated interest on those accruals, by the lump sum factor, to yield what it calls the participant's "cash balance." That is equal to the lump sum pension benefit that the participant would receive if he quit immediately but was treated as if he were of normal retirement age and therefore not entitled to receive any further yearly accruals or interest.

All this is rather dense; an example may clarify. Suppose an employee begins working for the company in 1987 at age 50, at an annual salary of $50,000. Assume a fixed index rate of 4 percent and that the yearly accrual is three-fourths of one percent of his salary, or $375. Thus:

| Year | Prior Accrued Benefits | x | Growth at Index Rate | = | Prior Accrued Benefits Plus Interest | + | Yearly Accrual | = | Total Accrued Benefits |
|---|---|---|---|---|---|---|---|---|---|
| 1987 | $0 | x | 104% | = | $0 | + | $375 | = | $375 |
| 1988 | $375 | x | 104% | = | $390 | + | $375 | = | $765 |
| 1989 | $765 | x | 104% | = | $795.60 | + | $375 | = | $1,170.60 |
| 1990 | $1,170.60 | x | 104% | = | $1,217.42 | + | $375 | = | $1,592.42 |
| 1991 | $1,592.42 | x | 104% | = | $1,656.12 | + | $375 | = | $2,031.12 |
| 1992 | $2,031.12 | x | 104% | = | $2,112.36 | + | $375 | = | $2,487.36 |
| 1993 | $2,487.36 | x | 104% | = | $2,586.85 | + | $375 | = | $2,961.85 |
| 1994 | $2,961.85 | x | 104% | = | $3,080.32 | + | $375 | = | $3,455.32 |
| 1995 | $3,455.32 | x | 104% | = | $3,593.53 | + | $375 | = | $3,968.53 |
| 1996 | $3,968.53 | x | 104% | = | $4,127.27 | + | $375 | = | $4,502.27 |

At age 60 the employee will have accrued benefits of $4,502.27 and so will have a cash balance of $36,018.16 (8 x $4,502.27). If he quits then, he will receive no further yearly accruals but his retirement benefits will continue to grow at the annual index rate of 4 percent, giving him a cash balance at age 65 of $43,821.60 ($36,018.16 x $1.04^5$). That will be his lump sum retirement benefit if he chooses the lump sum in preference to an annuity.

At age 65 that benefit is equal to the cash balance. But until Meriter attempted to amend the plan in 2003 (as we discuss below), an early retiree who preferred a lump sum to an annuity received the cash balance as of the date of his early retirement. If the employee in our numerical example retired at 60, he could have chosen to receive a lump sum then of $36,018.16, while as mentioned earlier if he quit at 60 but waited to take his retirement benefit until he was 65 he would stop receiving yearly accruals (0.75% of his salary) but continue to receive interest at the index rate and so at 65 he would receive $43,821.60.

But ERISA requires that an early retiree receive the "actuarial equivalent" of the pension benefits to which he would be entitled at normal retirement age. That would be the lump sum pension benefit (if the retiree prefers that to an annuity) that the plan participant would receive at age 65, discounted to present value to reflect the fact that a dollar received today is worth more than a dollar received in the future because if received today it can be invested and immediately begin

growing. See 29 U.S.C. § 1054(c)(3); *Berger v. Xerox Corp. Retirement Income Guarantee Plan*, *supra*, 338 F.3d at 758-59, 761. In our example of a 60-year-old employee who has a current cash balance of $36,018, his benefits would be projected forward at the 4 percent index rate to grow to $43,821 at the normal retirement age of 65 but then discounted to present value at the discount (interest) rate prescribed by ERISA.

The interplay between future indexing and discounting is called a "whipsaw" because it involves looking forward to the value at normal retirement age and then backward to the present and thus resembles the action of a two-person saw (a "whipsaw"). ERISA fixes the discount rate using a complicated formula based on bond interest rates. See 26 U.S.C. §§ 417(e)(3)(C), 430(h)(2)(C)-(D); cf. *Berger v. Xerox Corp. Retirement Income Guarantee Plan*, *supra*, 338 F.3d at 759. If the index rate exceeds the discount rate, the present value of the retirement-age lump sum pension benefit will exceed the current cash balance, because the retirement benefit will grow at a faster rate through interest accrual than it shrinks through discounting. For example, at a discount rate of 2 percent, the 60-year old employee in our example would receive $39,690 (= $43,821 / $1.02^5$) upon quitting rather than just $36,018.16. A further complication, which we can ignore however, is the discounting required when the early retiree chooses an annuity rather than a lump sum. The earlier the annuity begins, the longer it will be received, and to adjust, the amount of the annuity is reduced.

One subclass is complaining about failure to whipsaw. Another is complaining about the index rate. From 1987 through 2002, Meriter's plan fixed the index rate at 4 percent, but it was the company's practice to calculate the plan participants' cash balances by using the higher of 4 percent or three-fourths of the pension plan's rate of return on its assets the previous year. The second method produced a higher than 4 percent interest rate (for example, 7.5 percent if in the previous year the plan had earned a 10 percent rate of return) in 9 of the 15 years between 1987 and 2002. The plaintiffs argue, and Meriter denies, that this "practice" amended the plan, entitling early retirees who chose to receive a lump retirement benefit to have the benefit of the higher index rate when applicable. If so, the district court will need to determine when the practice became firmly enough established to entitle these class members to the higher index rate and whether all members should be entitled to the same rate or whether the rate should vary with the member's beginning and ending dates of employment and hence with the plan's rate of return in the years in which he was employed. See *Thompson v. Retirement Plan for Employees of S.C. Johnson & Son, Inc.*, No. 07-cv-1047-JPS, 2012 WL 2504013 (E.D. Wis. June 28, 2012).

In 2003, Meriter changed the index rate from 4 percent or three-fourths of Meriter's rate of return the preceding year, whichever was higher, to a Treasury Bond rate (more precisely, the "annual yield on 10-year Treasury Constant Maturities that is in effect for the November 30th preceding the Plan Year") or 4 percent, whichever

was higher. Currently that Treasury rate is below 2 percent. Because under the previous method of calculating the index rate the rate was more often than not higher than 4 percent and now it is unlikely to exceed 4 percent, several of the subclasses complain that the amended index rate is actually a "cutback"—an amendment, which ERISA forbids, 29 U.S.C. § 1054(g), that reduces an accrued retirement benefit. Alternatively they argue that even if it wasn't a cutback, still they are entitled to the previous index rate because the amendment was invalid, not having been adopted by Meriter's board of directors.

There are also complaints about what is called "wear away." The vested benefits of plan participants as of 2003 were sacrosanct; that's what "vested" means. But as amended that year the plan did not credit future benefits to a participant until they exceeded his vested benefits under the previous plan. One subclass complains that such wear-away amounts to requiring plan participants to re-earn benefits they had earned already. See, e.g., *Tomlinson v. El Paso Corp.*, 653 F.3d 1281, 1284 (10th Cir. 2011); *Sunder v. U.S. Bancorp Pension Plan*, 586 F.3d 593, 600-01 (8th Cir. 2009).

Each subclass complains about several features of the Meriter plan, the complaints overlap, and some subclasses were created just because of the different dates at which employees participated in the plan, the different claims of early retirees versus those who retired at 65, and the different forms of pension benefit (lump sum versus annuity). Trying to determine

which subclasses make which claims is dizzying, but as long as each subclass is homogeneous, in the sense that every member of the subclass wants the same relief, and each subclass otherwise satisfies the requirements for certifying a class, so that each could be the plaintiff class in a separate class action, there is no objection to combining them in a single class action. Indeed that's the superior approach because an understanding of the entire plan, and of its evolution over the 23-year complaint period, provides essential background for understanding the claims of the members of all the subclasses.

But Meriter argues that because the subclasses make so many different claims, the class action does not satisfy the requirement of Rule 23(b)(2) that the defendant have "acted . . . on grounds that apply generally to the class." The requirement applies to subclasses, however, rather than to the class action out of which the subclasses have been carved. "[T]he fact that a class is overbroad and should be divided into subclasses is not in itself a reason for refusing to certify the case as a class action." *Culver v. City of Milwaukee*, 277 F.3d 908, 912 (7th Cir. 2002). One can if one wants think of this class action as actually 10 separate class actions and apply the standard in Rule 23(b)(2) to each of them—and each of them satisfies the standard.

Meriter's further argument that class members who are no longer participants in the plan are not entitled to declaratory or injunctive relief because such relief is forward looking and they want retrospective relief—that is, money—is silly. Those class members who

have not yet quit or retired from Meriter are seeking forward-looking relief as distinct from damages. They are not yet entitled to any pension benefits, and are seeking declaratory and injunctive relief in order to increase their future entitlement to those benefits. Moreover, a declaration is a permissible prelude to a claim for damages, that is, to monetary relief for a concrete harm already suffered. See *Berger v. Xerox Corp. Retirement Income Guarantee Plan*, *supra*, 338 F.3d at 763-64. Those class members who are no longer participants in the plan, because they have quit or retired (and so are beneficiaries rather than participants), seek reformation of the Meriter plan as a basis for claiming additional pension benefits. Those benefits would not be damages. They would be the automatic consequence of a judicial order revising the Meriter plan to make it more favorable to participants.

Meriter argues that *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), precludes a Rule 23(b)(2) class action in which monetary as well as declaratory or injunctive relief is sought. *Wal-Mart* was a class action by current and former employees complaining that the company's practice of delegating employment decisions to its local managers enabled those managers to discriminate against women employees in violation of Title VII. The suit sought backpay for the class members as well as declaratory and injunctive relief. The objection to certification was that no company-wide policy was being challenged. The only relevant corporate policies were a policy *forbidding* sex discrimination and the policy of delegating employment decisions to local managers. The

first could not violate Title VII and the second was a necessity because Wal-Mart has more than a million employees. If local managers discriminated against employees on a forbidden ground, the employer would be liable for their unlawful conduct, by virtue of the doctrine of respondeat superior. But the existence of discrimination would have to be proved case by case, on the basis of evidence (including the identity of supervisors) specific to each class member; and likewise the remedy would have to be determined on the basis of evidence specific to each class member. Missing, therefore, was "commonality" (community of interest among class members), a prerequisite for class certification. Fed. R. Civ. P. 23(a)(2).

Those are not problems in this case. But the Court expressed doubt whether the class in a (b)(2) class action can *ever* seek damages, saying: "Our opinion in *Ticor Title Ins. Co. v. Brown*, 511 U. S. 117, 121 (1994) (per curiam) expressed serious doubt about whether claims for monetary relief may be certified under [(b)(2)]. We now hold that they may not, *at least where (as here) the monetary relief is not incidental to the injunctive or declaratory relief*." 131 S. Ct. at 2557. The passage we have italicized is a significant qualification, and it is repeated on the same page of the Court's opinion and elsewhere. See *id*. at 2560.

Meriter points to the statement in *Wal-Mart* that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. [1] It does not authorize class

certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant. [2] Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." 131 S. Ct. at 2557 (emphasis in original).

Limitation [1] is inapplicable to a subclass all of whose members have the same claim, so that there is no basis for granting different declaratory or injunctive relief to different members. And that is this case, though with two exceptions. First, some of the plan participants may have discovered Meriter's alleged violation of ERISA before others did; and because "an ERISA claim accrues when the plaintiff knows or should know of conduct that interferes with the plaintiff's ERISA rights," *Thompson v. Retirement Plan for Employees of S.C. Johnson & Son, Inc.*, 651 F.3d 600, 604 (7th Cir. 2011), those earlier discoverers cannot reach back as far in claiming benefits wrongfully denied them without running afoul of the statute of limitations. But it may be that Meriter's statute of limitations defense applies to all plan participants equally because the defense is based on communications made simultaneously to all participants, see, e.g., *id*. at 605, such as a summary plan description, rather than on communications to or information otherwise available to only some participants. If the former is true, there will no individualized determinations; and as Meriter has failed to identify any communications to individual plan participants, the district judge can't be faulted for having concluded that the statute of limitations defense could be resolved on a classwide basis.

Second, plan participants may have had differing expectations concerning the significance of Meriter's practice—for it was not written into the plan—of making the index rate the higher of 4 percent or three-fourths of the plan's rate of return the previous year. Meriter argues that if the practice created an entitlement, it did so only for plan participants who believed that the practice would continue, and only as of the date they formed that belief. The district judge was understandably queasy about having to administer more than 4000 different pension plans—different because the higher index rate would kick in at a different date for each participant. He was correct to rule that when and if Meriter established that the entitlement differed among participants, the relevant (b)(2) subclass could be decertified. See Fed. R. Civ. P. 23(c)(1)(C); *In re Zurn Pex Plumbing Products Liability Litigation*, 644 F.3d 604, 617 (8th Cir. 2011).

Limitation [2] in the *Wal-Mart* opinion refers to "individualized" awards of monetary damages, which we understand to be awards based on evidence specific to particular class members. Suppose in *Wal-Mart* the class representative had been asking that every class member be awarded $10,000 in backpay. That might be fine for some or even most of the class members, but what of a class member who thought she could prove she should be awarded $50,000? Had she been notified of the class action and of what the class representative was seeking by way of relief, she might have opted out and brought her own suit. But there is no requirement of notice, or even of permitting opt outs, in a Rule 23(b)(2)

class action. Notice to class members *may* be required by the district court. Fed. R. Civ. P. 23(c)(2)(A). But unlike the case of a (b)(3) class action, see Fed. R. Civ. P. 23(c)(2)(B), notice is not mandatory. And when it is ordered, the purpose usually is to enable class members to challenge the class representatives or otherwise intervene in the suit, rather than to allow them to opt out. See Fed. R. Civ. P. 23(d)(1)(B)(iii). Indeed, there is no mention of opting out in the rule, although the case law permits the judge to allow opt out. *Jefferson v. Ingersoll International Inc.*, 195 F.3d 894, 898 (7th Cir. 1999); *Williams v. Burlington Northern, Inc.*, 832 F.2d 100, 103 and n. 2 (7th Cir.1987); *Eubanks v. Billington*, 110 F.3d 87, 93-95 (D.C. Cir. 1997).

In this case, however, all that the class is seeking, which is to say all that the subclasses are seeking, at least initially, is a reformation of the Meriter pension plan—a declaration of the rights that the plan confers and an injunction ordering Meriter to conform the text of the plan to the declaration. If once that is done the award of monetary relief will just be a matter of laying each class member's pension-related employment records alongside the text of the reformed plan and computing the employee's entitlement by subtracting the benefit already credited it to him from the benefit to which the reformed plan document entitles him, the monetary relief will truly be merely "incidental" to the declaratory and (if necessary) injunctive relief (necessary only if Meriter ignores the declaration).

This condition may not be satisfied in regard to all the members of the class. Errors may be alleged in an em-

ployee's pension-related employment records and an evidentiary hearing may be required to determine the merits of the allegation. We cannot at this early stage in the litigation estimate the number of claims that will require a hearing or the average length of such a hearing. But given the potential harm to individual class members if the monetary relief to which each is entitled is determined by averaging rather than by individual determination, either the class members should be notified of the class action and allowed to opt out (and notice and opt out, we just said, are permitted in a (b)(2) class action even though not required), or the class should be bifurcated, much as a non-class action for damages is often bifurcated, which is to say divided into a trial on liability followed by a trial on damages if liability is found.

In the present case, bifurcation (called "divided certification" in the class action context) would mean a (b)(2) proceeding first, and if the plaintiffs obtain declaratory relief a (b)(3) proceeding (where notice and the right to opt out are mandatory) to follow. *Lemon v. International Union of Operating Engineers, Local No. 139, AFL-CIO*, 216 F.3d 577, 581 (7th Cir. 2000); *Jefferson v. Ingersoll International Inc., supra*, 195 F.3d at 898; *Gooch v. Life Investors Ins. Co. of America*, 672 F.3d 402, 427-28 (6th Cir. 2012); *Eubanks v. Billington, supra*, 110 F.3d at 96. Once declaratory relief is ordered, all that is left is a determination of monetary relief, and that is the type of proceeding for which (b)(3) is designed.

Divided certification might not be optimal if the issues underlying the declaratory and damages claims over-

lapped. As pointed out in *Lemon* and *Jefferson*, the Seventh Amendment has been interpreted to entitle a party in a divided-certification case to demand that the damages claims be tried first, to a jury. See *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962). In such a case the preferable alternative might be to stick with the (b)(2) certification but to require that the class members receive notice and have an opportunity to opt out of the class. But the parties have consented to a bench trial on all issues, so there is no problem with having declaratory relief determined by the judge even if his determination would resolve issues that, were it not for that consent, would by virtue of the *Beacon Theatres* rule be decided by a jury instead.

Should it appear that the calculation of monetary relief will be mechanical, formulaic, a task not for a trier of fact but for a computer program, so that there is no need for notice and the concerns expressed in the *Wal-Mart* opinion are thus not engaged, the district court can award that relief without terminating the class action and leaving the class members to their own devices and also without converting this (b)(2) class action to a (b)(3) class action. *Randall v. Rolls Royce, Inc.*, 637 F.3d 818, 826 (7th Cir. 2011); *Berger v. Xerox Corp. Retirement Income Guarantee Plan, supra*, 338 F.3d at 764; *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir. 1998). This is on the assumption that *Wal-Mart* left intact the authority to provide purely incidental monetary relief in a (b)(2) class action, as we think it did, though the

Ninth Circuit expressed doubt in *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986 (9th Cir. 2011).

Meriter's final argument is that the class cannot be certified at all, even under (b)(3), because conflicts among class members make it impossible for class counsel to represent the entire class adequately, as required by Rule 23(a)(4). Conflicts between class members are different from differences in class members' entitlements, which we discussed earlier. Conflicts of interest, as distinct from differences in entitlements, create an issue of adequacy of representation by requiring the class representative to choose between competing class members.

Meriter identifies two conflicts of interest. First, it submitted expert evidence that some participants would prefer a fixed index rate while others might prefer a variable rate based on the date of retirement; depending on when a participant retired, the variable rate might be higher than the fixed rate, while for participants who had retired on a different date the fixed rate might be higher. Second, there may be a conflict over the date when the 2003 plan amendments became effective. The amended plan harmed some participants by reducing the index rate but benefited others by adopting a whipsaw, which the old plan had lacked. Some class members would benefit by proving that the 2003 amendments had never been adopted by Meriter's board of directors, while others might be harmed ("might" because the plaintiffs argue that ERISA requires Meriter to apply the whipsaw method even under the old plan).

The district judge found these conflicts of interest to be too hypothetical to bar class certification. They've been alleged, some evidence has been submitted, but Meriter has not yet proved they're real. Its contention that some class members will be hurt by class treatment rings hollow. It knows the names of all the class members and could have found one—if there is one—who if informed of the class action would express concern that it might harm him. Meriter either didn't look for such a class member, which would be inexcusable, or it looked but didn't find one, which would probably mean that there isn't any such class member.

And should the conflicts prove real despite our skepticism, it may be possible to resolve them by dividing some of the subclasses and appointing new class representatives for the newly carved out subclasses. It is premature to declare the alleged conflicts of interest an insoluble bar to the class action. See *Kohen v. Pacific Investment Management Co. LLC*, 571 F.3d 672, 680 (7th Cir. 2009); *Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975).

The class certifications challenged by Meriter are

AFFIRMED.