ENTERED this 30 day of March, 1990.

Melvin **BALDRIDGE** and Billy Joe Durden, by Their Attorney and Next Friend, Griffin J. **STOCKLEY**, and Vickie Teague, by her Mother and Next Friend, Billie Harbour, on Behalf of Themselves and All Other Individuals Similarly Situated, Plaintiffs,

v.

Bill **CLINTON**, Individually and in His Official Capacity as Governor of the State of Arkansas, Ray Scott, Individually and in his Official Capacity as Director of the Department of Human Services, Mental Health Board and

---

Robert K. Taylor, Blanche Choate, Darrell Williams, Donald Purcell, Martha Culp, Individually and in their official capacities as Members of the Board, Robert F. Shannon, Individually and in his Official Capacity as Commissioner of the Division of Mental Health Services, Phil Daugherty, Individually and in His official Capacity as Acting Mental Health Deputy Commissioner for Long Term Care, Developmental Disabilities Services Board and Dorothy MacDonald, Tom Smith, Marion Hickey, Haddon Brown, Elbert Ray, John Mazzanti, James Burgess, Individually and in their Official Capacities as Members of the Board, and Ray Nelson, Individually and in his Official Capacity as Commissioner of the Division of Developmental Disabilities Services, Defendants,

Advocates for Human Development Center Residents, Inc., Intervenor,

Advocacy Service, Inc., Intervenor.

No. LR–C–83–1004.

United States District Court, E.D. Arkansas, W.D.

Sept. 13, 1991.

David Ferleger, Philadelphia, Pa., Thomas Stone, Dover and Dixon, Little Rock, Ark., for plaintiffs.

James William Cain, Jr., Advocacy Services, Inc., Little Rock, Ark., for intervenor-plaintiff.

Debby Thetford Nye, Department of Human Services, Office of Gen. Counsel, Kay J. Demailly, Roberta B. Friedlander, Angela S. Jegley, Asst. Attys. Gen., Little Rock, Ark., for defendants.

Robert D. Smith, Smith, Jernigan & Smith, William F. Sherman, Jacoway, Sherman & Pence, Little Rock, Ark., for intervenor-defendant.

## ORDER

HENRY WOODS, District Judge.

I. Introduction .

This case was filed in November, 1983 and certified as a class action September 24, 1984. The class consisted of eight named plaintiffs and "all other institutionalized persons who now, or in the future, are in the custody of the Department of Human Services, including the Division of Mental Health and the Division of Developmental Disabilities Services, and who have been identified by appropriate professionals as receiving inadequate treatment, care and/or training and of being inappropriately placed." Although subclasses were never certified, the class included persons in custody of several different divisions or institutions of the Department of Human Services (DHS).

The parties have, through consent decrees, resolved issues involving class members in custody of the DHS at the Arkansas State Hospital, Rogers Hall and Benton Services Center. By terms of one consent decree, a court monitor was appointed. The monitor, Dr. John Marr, made recommendations and filed quarterly reports with the court. The case was administratively closed.

In 1988, the case was reopened for the sole purpose of resolving the issues relating to the Human Development Centers ("HDC"), which are residential institutions, housing from 76 to 611 developmentally disabled persons.[1] The parties agree that all issues in this lawsuit have been resolved except for those involving HDCs.

---

1. HDCs are not the only facilities for the developmentally disabled. The State of Arkansas also operates various other community-based residential facilities for some developmentally disabled.

On February 4, 1991, Advocates for Human Development Center Residents (AHDCR) moved to intervene in the lawsuit. AHDCR, purporting to represent hundreds of parents and guardians of HDC residents, *opposes* the claims and objectives of the plaintiff class and contends that the amended complaint should be dismissed for failure to state a claim.

In response to the AHDCR motion to intervene, the defendants asked the Court to consider decertifying the class. The defendants raised changed and improved conditions in the HDCs over the seven years since the class encompassing HDC residents was certified and expressed concern that the named plaintiffs did not represent the best interest of the class members.

In light of the contentions of the defendants and the AHDCR, on May 8, 1991, the Court ordered the plaintiffs to show-cause why the class should not be decertified. Subsequently, on June 12, 1991, Advocacy Services, Inc., a federally funded agency, moved to intervene in support of maintaining the class. Both AHDCR and Advocacy Services, Inc. were permitted to intervene for the limited purpose of participating in the show cause hearing. A two-day hearing was held July 18th and 19th, 1991, to give the plaintiffs an opportunity to show why this case should continue as a class action.

Thus, the plaintiffs had the burden of proving, "actual, not presumed, conformance with Rule 23(a)." *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982).

## II. Findings of Fact

1. Through Joint Stipulation, the parties have agreed that the total census of the six HDCs [2] as of May 30, 1991 was 1,257.

2. The plaintiffs produced evidence relating to only one of the named plaintiffs, Melvin Baldridge. Baldridge no longer resides in a Human Development Center; he currently lives in a single family home. Integrity, Inc., a licensed, private non-profit Developmental Disabilities Services provider, maintains a 24–hour staff person with Baldridge so that he can remain in the community. Costs for these supports are paid by Baldridge's supplemental security income and Arkansas Medicaid Waiver dollars.

3. John Jones, Baldridge's limited guardian, testified that he participated as a member of Baldridge's Interdisciplinary Team and took part in Baldridge's annual individual habilitation plan. Jones conceded that, as limited guardian, he had the authority to make all placement decisions regarding Melvin Baldridge.

4. Baldridge was institutionalized in a mental health facility at the age of 15. As a result of the January 17, 1985 Consent Decree in this case, he was moved to a special treatment unit located at the Alexander Human Development Center.

5. Jones participated in each decision to change Baldridge's placement, including the move from an HDC to the current community placement. Jones agreed that community placements should be made through gradual transitional steps rather than abruptly.

6. Jones insisted that, as a part of Baldridge's community placement plan, respite care be provided by an HDC. Baldridge has used short periods of HDC respite care since moving to his single family placement in the community.[3]

7. Jones conceded that Baldridge was never legally committed to the HDC. It was Jones' decision to consent to Baldridge's placement at an HDC, and this consent could have been withdrawn at any time and Baldridge discharged from the HDC.

8. All residents of HDCs are voluntarily placed there, through their parents or guardians.

9. The plaintiffs offered evidence concerning five other developmentally disabled

---

**2.** HDCs operate in the following locations: Conway, Alexander, Arkadelphia, Jonesboro, Booneville and Warren.

**3.** For example, Baldridge returned to an HDC briefly following an incident in which he stole an automobile.

persons, Richard Muse, Christine Bland, Francis Redman, Norman and Pam, none of whom are named plaintiffs.

10. Muse, a 27 year-old with moderate mental retardation and extensive medical involvement, resided at the Conway Human Development Center from age 11 until July, 1991. In June, 1991, Muse requested information and exploration into placement in the community. On July 16, 1991, Muse moved from the Conway HDC to a ten-bed Intermediate Care Facility for the Mentally Retarded ("ICF/MR").

11. Muse testified that other residents of the Conway HDC would like to move to a community setting, but limited identification to his best friend, Norman, and his girl friend, Pam. He indicated that, although Norman and Pam would like to leave the HDC, they had never asked to be moved into a community placement.

12. Muse offered no evidence from which the Court can infer any unconstitutional condition in the HDC where he previously resided.

13. Georgann Hood testified as the parent of a former HDC resident, Christine Bland, and as limited guardian for a current HDC resident, Francis Redman.

14. Christine Bland lived in the Arkadelphia HDC for three years; she moved to a group home in Russellville in 1986, at the suggestion of the Department of Human Services. In 1989, Bland moved, at her mother's request, from the group home into her mother's home. Bland continues to receive support services, including respite care at HDCs, through the Developmental Disabilities Services Division of the Department of Human Services.

15. As a member of the Interdisciplinary Team for her ward Francis Redman, Hood participates in Redman's annual Individual Habilitation Plan.

16. An Interdisciplinary Team considers appropriate placement alternatives for all clients, including those who are wards of court-appointed guardians. Hood has inquired of Department of Disabilities Services staff about community placement options; however, she has never requested an alternative community placement for her ward, Francis Redman. Redman has never expressed to Hood a desire to leave the HDC.

17. Hood testified that the plaintiffs represent her interests as parent of Bland and limited guardian of Redman.

18. Dr. Sue Gant, plaintiffs' expert, testified that in her visit to Conway and Alexander HDCs, she saw evidences of extensive use of restraints. She noted a time-out room, leather shackles, a waist belt, a surgical mask (Booneville HDC), arm splints, leg shackles, a posey jacket, and five restraint chairs (Conway HDC).

19. Dr. Gant acknowledged that she was aware that federal standards governing Intermediate Care Facilities for the Mentally Retarded permit the use of all methods of restraint which she noted. She testified that she did not believe these federal standards nor the standards of the Accreditation Council on Services for People with Developmental Disabilities, discussed infra, were sufficient to assure quality of care for the developmentally disabled.

20. Dr. Gant opined that all persons in institutional settings, such as HDCs, are inappropriately placed.

21. Mike McCreight, Developmental Disabilities Services Director, testified that physical restraints are used only as a last resort with a few HDC residents. Protective restraints such as football helmets and arm splints are used to protect against injury and self-abuse.

22. The Accreditation Council on Services for People with Developmental Disabilities (ACDD) is a private, national, voluntary accrediting organization. ACDD accredits facilities that provide services to people with developmental disabilities.

23. The ACDD is governed by a Board of Trustees which is composed of prominent professionals from a variety of disciplines with different perspectives on services for the developmentally disabled population. The ACDD has developed standards of care for the developmentally disabled which represent a national consensus by experts in this field of best practice.

24. ACDD standards, developed and updated periodically, include normalization;

least restrictive environment; protecting rights of individuals; service delivery; staff qualifications; and staff training.

25. The ACDD standards serve as the baseline standards for Health Care Financing Administration for Intermediate Care Facilities for the Mentally Retarded.

26. No nationally recognized set of standards is more rigorous or stringent than those of the ACDD. Because of the complexity and cost of meeting ACDD standards, some facilities previously accredited by ACDD have recently chosen to permit their accreditation to lapse.

27. ACDD accredits facilities in 22 states. Currently 132 facilities in the United States are accredited by ACDD.

28. According to James Gardner, Chief Executive Officer of the ACDD, after several days of inspecting an institution, the ACDD: (i) denys accreditation; or (ii) accredits the institution for one year; or (iii) accredits the institution for two years, the highest accreditation rating. Two-year accreditation is given to institutions which meet at least 75% of standards, which exceed 600 in number. No facility in the United States meets, or is expected to meet, every standard.

29. Conway HDC and Arkadelphia HDC are accredited by the ACDD. Conway HDC has received two-year accreditation from the ACDD since 1985, except for the year 1989, in which a one-year accreditation was received. Accreditation applications are pending for the remaining four HDCs.

30. Gardner testified that a deficiency noted in an ACDD evaluation is not tantamount to an unconstitutional condition because the ACDD standards exceed minimal requirements.

31. Shirley Gamble, Assistant Director of the Division of Economic and Medical Services testified about her responsibilities as Director of the Office of Long Term Care. As Director of Long Term Care, Gamble is the agent for the federal government charged with surveying all state operated HDCs in Arkansas.

32. The Director of the Office of Long Term Care certifies facilities enrolled in the Medicaid Program as Medicaid Providers and is responsible for annual facility surveys and inspection of resident care. She determines whether each facility meets federal requirements and whether each Medicaid resident is appropriately placed and receiving appropriate care and services. In Arkansas, over 99% of the residents of HDCs are Medicaid recipients.

33. The survey instrument used by the Office of Long Term Care is established by federal regulation and sets forth specific standards for compliance.

34. The Office of Long Term Care screens all applications for admissions into HDCs and reviews appropriate placement decisions within the inspection of care process by conducting an assessment of each individual's needs and the range of services available to meet those needs. The range of services in Arkansas includes HDC placement, Infant Infirmary, ten-bed Intermediate Care Facilities for the Mentally Retarded, community group homes, in-home waiver service, nursing homes, residential care, personal care Medicaid and apartment services.

35. The inspection of care process used in Arkansas is consistent with federal regulations set forth at 42 C.F.R. § 456.600.

36. The Office of Long Term Care surveys each resident of Human Development Centers every year to determine if the client's needs and abilities agree with observations and with admission in his or her facility. If the resident's needs cannot be met by the facility, then alternate placement is recommended by the Office.

37. If a resident is deemed to be inappropriately placed, that finding is included on the inspection of care list for that facility. A meeting is held with DDS staff to discuss appropriate placement. The final placement determination is made by the Utilization Review Committee, a part of the Office of Long Term Care. If the resident objects to the final placement of the Utilization Review Committee, he or she is afforded notice and a hearing through the Department's administrative process.

38. Accordingly to Gamble, all six HDCs are currently licensed and certified in good standing and are in full compliance with state and federal standards.

39. Haddon Brown, President of Advocates for Human Development Center Residents, Inc. is the parent of an adult daughter who is a resident of the Conway HDC. Brown was formerly a DDS Board member and defendant in this case. His term on the DDS Board expired in 1986.

40. Brown testified that more than 900 parents and guardians of HDC residents responded to AHDCR surveys and indicated interest in intervening to oppose the claims and objectives of the plaintiffs in this lawsuit. Additionally, 117 parents or guardians authorized their parent association presidents to represent them.

41. Even taking into account the possibility of duplication of representation (i.e., two parents of one HDC resident might have responded to the AHDCR survey), there are obviously hundreds of parents/guardians of HDC residents who oppose the primary objectives of the plaintiffs. Brown indicated that many parents/guardians were unaware of this lawsuit prior to receiving the AHDCR survey.

42. Significantly, Billy Jean Harbour, mother of named plaintiff, Vicki Teague, was among the respondents to the AHDCR survey who indicated opposition to the plaintiffs' current claims and objectives. Vicki Teague is apparently no longer a resident of an HDC.

III. Conclusions of Law

1. The narrow issue before the Court is whether the plaintiffs have satisfied all of the requirements of Rule 23 of the Fed. R.Civ.P. so that this case can continue as a class action. The hearing was not a hearing on the merits; however, as noted in the July 16, 1991 pretrial order, a class certification hearing must, necessarily, touch on the merits of the case.

■■■ The Court has an ongoing duty to ensure compliance with Rule 23(a), even after certification. *Hervey v. City of Little Rock*, 787 F.2d 1223 (8th Cir.1986).

Compliance with Rule 23(a) requirements is indispensable. *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982).

■■ 2. Plaintiffs bear the burden of proving each prerequisite set out in Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Each of these prerequisites must be met, in addition to at least one of the situations set forth in Rule 23(b): (1) the prosecution of separate actions by or against individual members of the class would create a risk of either inconsistent adjudications or individual adjudications which would be dispositive of claims of others similarly situated; or (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class; or (3) the court finds that the question of law or fact common to the member of the class predominates over any questions affecting only individual members.

3. Plaintiffs' pleadings must be precise, because, "without reasonable specificity the court cannot define the class, cannot determine whether the representation is adequate...." *Falcon*, 457 U.S. at 161, 102 S.Ct. at 2372. The Supreme Court has cautioned courts of the "significant" risk of "potential unfairness to the class members bound by the judgment if the framing of the class is overbroad." *Id.* The Court went on to warn against a "tacit assumption" that "manna will fall on all members of the class." *Id.*

4. In order to state a claim for relief, plaintiffs must allege "substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg v. Romeo*, 457 U.S. 307, 323, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982).

■ It is unclear what conditions, except for the allegation of excessive use of restraints, the plaintiffs specifically contend are unconstitutional in the HDCs. The plaintiffs' expert testified that all persons in institutions are inappropriately placed. Assuming it to be true that optimal placement for all developmentally disabled persons is in small community settings, and assuming that the defendants have refused to transfer residents from HDCs to group homes, under current law no constitutional violation, per se, has occurred. The law is settled: the constitution does not require that habilitation of mentally retarded persons be provided in a community setting. In fact, the Supreme Court squarely held, "It is not appropriate for the court to specify which of several professionally acceptable choices should have been made." *Id.* at 321, 102 S.Ct. at 2461.

■ Certainly, inappropriate placement can operate to deprive a person of his or her constitutionally protected rights; but for purposes of scrutinizing for class certification, the question is whether there is evidence of widespread and systemic misplacement of numerous persons whose placement is so inappropriate that their constitutional rights have been denied. The uncontested evidence indicates that the process used by the defendants to place persons in appropriate facilities is adequate. Even the plaintiffs' expert conceded that the defendants' process—"on paper"—was adequate. There was no evidence that the procedures used by the defendants to place developmentally disabled persons is unconstitutional, or that the procedures, as applied, deprive numerous persons of their constitutional rights.

■ Even if developmentally disabled persons had a constitutional right to live in a community setting rather than in an institution such as an HDC, the plaintiffs failed to produce evidence of a single HDC resident who had, or has, requested community placement and been denied. Not only did the plaintiffs fail to offer a named plaintiff for whom community placement has been denied, plaintiffs failed to offer evidence of *any* HDC resident in such a situation.

■ With respect to restraints, the use of the restraints identified by plaintiffs' expert is not, in and of itself, unconstitutional. Rather, due process is satisfied if restraints are imposed "when and to the extent professional judgment deems this necessary to assure such safety or to provide needed training." *Youngberg,* at 324, 102 S.Ct. at 2462.

■ The evidence offered by the plaintiffs did not indicate widespread use of restraints; and there was no evidence of widespread *misuse* of restraints. This is not to say that there are, or have been, no instances of excessive use of restraints with particular individuals. There may have been, and there may be now. However, the evidence indicated that restraints are authorized for use with only a few individuals. As with the plaintiffs' allegation of inappropriate placement of individuals, there was no evidence that restraints are, or were, either used or misused on so many residents that their joinder in a lawsuit would be impractical.

■ 5. The plaintiffs argue the commonality and numerosity requirements of Rule 23(a) are met in this case because all 1257 residents of the six HDCs are subjected to common rules and regulations, common habilitation plan rules and procedures, common incident/death/abuse/neglect procedures, common need for habilitation, common need for quality assurance systems, common need for protection from harm, common need for lifelong supports and services, common review by the federal Intermediate Care Facilities for the Mentally Retarded standards, common training provided to staff, common need for appropriate conditions including appropriate placement, common budgeting and allocation of resources by the central office.

■ This view distorts the commonality requirement. Class members must have a common *question* of law or fact. Stated another way, the plaintiffs must suffer a *common deprivation.* It is not enough to say class members share a common circumstance, they must share a common deprivation. In order to meet the commonality

**128**

and numerosity requirements, there must be so many class members who are entitled to relief from an unconstitutional situation that their joinder in the lawsuit would be impractical.

6. Plaintiffs must also show that the claims of the representative parties are typical of the claims of the class. The original class definition encompassed "institutionalized persons." The parties have agreed that only the HDCs are at issue. Uncontradicted evidence offered at the hearing indicated that none of the named plaintiffs currently resides in an HDC. There is serious question whether plaintiffs who live in private or community homes can adequately represent permanent HDC residents, especially when the only issue to be litigated is conditions in HDCs.

Furthermore, because allocation of resources among private homes, group homes and HDCs would likely be an issue if the case were tried, there is potential for a conflict of interest between persons residing in HDCs and those in private or group homes.

Plaintiffs argue that one named plaintiff, Melvin Baldridge, occasionally uses HDCs for respite care. However, I find that occasional respite use of HDCs, or the possibility of return in the future to an HDC as primary residence, fails to satisfy the requirement that representative, named plaintiffs have claims typical of the class.

7. The AHDCR produced evidence indicating that hundreds and hundreds of parents oppose the objectives of the plaintiffs.[4] While the surveys may not have been conducted in an altogether scientific manner, nonetheless the Court was impressed with the work done by the AHDCR. Mr. Brown was not only credible, he was well-informed and obviously devoted to pursuing not only the best interest of his daughter, who resides in an HDC, but of developmentally disabled persons generally.

Parents and guardians have a due process interest in this case. The Supreme Court of the United States has held that the fundamental liberty interest of natural parents, "in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their children to the state." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982). Likewise, the Court of Appeals for the Eighth Circuit has held: "We can conceive of no more important relationship, no more basic bond in American society, than the tie between parent and child." *Bohn v. County of Dakota*, 772 F.2d 1433, 1435 (8th Cir. 1985), *cert. denied*, 475 U.S. 1014, 106 S.Ct. 1192, 89 L.Ed.2d 307 (1986). The liberty interest of parents in their children, "undecidedly warrants deference and, absent a powerful countervailing interest, protection." *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). The Court cannot and will not assume that parents' opinions and wishes in this case are adverse to those of their children, absent a strong showing to the contrary.

The plaintiffs made no showing of significant parent and guardian support for their objectives—including closing the HDCs. The High Court's warning against a tacit assumption that all will be well and that manna will fall on all members of the class seems particularly applicable to this case.

8. Developmentally disabled persons residing in HDCs have a constitutionally protected right to, "conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." *Id.* 457 U.S. at 324, 102 S.Ct. at 2462. Furthermore, the Supreme Court limited federal court review: "In determining what is 'reasonable' ... we emphasize that courts must show deference to the judgment exercised by a qualified professional. By so limiting judicial review of challenges

---

4. The plaintiffs contend that the AHDCR survey misstated the plaintiffs' goals and objectives, particularly with respect to plaintiffs' intention to close the HDCs. However, the plaintiffs' expert, Dr. Sue Gant, clearly stated that, in her opinion, no developmentally disabled person should live in an institution such as an HDC.

to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions should be minimized." *Youngberg*, at 322, 102 S.Ct. at 2461.

The plaintiffs have not only failed to establish the prerequisites necessary to maintain a class action, that is, that the rights of persons too numerous to join have been violated, they have failed to articulate how any resident's rights have been violated or what remedy they seek. I emphasize that this is not a new case where discovery might be in early stages. This case has been in federal court for eight years.

There has been no hearing on the merits, and the Court makes no finding regarding the possible violation of any HDC resident's rights; but the plaintiffs had the burden of making some showing that the defendants were, or are, violating specific rights of so many HDC residents that their joinder into the lawsuit would be impractical. No such showing was made.

Accordingly, the class is hereby decertified and the case is dismissed without prejudice. Individuals who feel their rights have been violated may file individual lawsuits.