Richard MESSIER, et al.,

v.

SOUTHBURY TRAINING
SCHOOL, et al.

No. 3:94–CV–1706 (EBB).

United States District Court,
D. Connecticut.

Nov. 5, 1998.

### RULING ON MOTION BY 611 STS RESIDENTS TO OPT OUT OF PLAINTIFF CLASS

BURNS, Senior District Judge.

This ruling presents the issue of whether 611 residents of Southbury Training School ("STS") and their respective guardians ("movants") may opt out of the plaintiff class, or in the alternative, be made a separate and distinct subclass. Four years ago, plaintiffs brought a class action seeking injunctive relief against defendants STS and three Connecticut state agencies, alleging violations of the Due Process Clause of the Fourteenth Amendment and several federal statutes. In their motion, movants request to opt out of the plaintiff class and intervene on the side of the defendants. For the following reasons, movants' motion [Doc. No. 333] is denied.

### BACKGROUND

This case began in October 1994 when seven residents of STS, People First of Connecticut, Inc., ARC/Connecticut, Inc., and Western Connecticut Association for Human

Rights brought a class action on behalf of all current and future STS residents against STS, the Department of Mental Retardation ("DMR"), the Department of Public Health ("DPH"), and the Department of Social Services ("DSS").[1] Plaintiffs alleged that the defendants' administration of STS and related community placement services for persons with mental retardation violated the following federal laws: (1) the Due Process Clause of the Fourteenth Amendment; (2) the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12132 (1997); (3) Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794 (1997); and (4) 42 U.S.C. § 1983 for the deprivation of rights under the Social Security Act, 42 U.S.C. § 1396a (1997). (Pls.' Third Am. Compl. ¶ 1.)

Plaintiffs sought an injunction to prevent new admissions to STS; to require STS professionals in conjunction with each resident and his or her guardian to develop and implement an individualized plan of treatment appropriate for that resident; to require defendants to evaluate all residents for possible community placement regardless of the severity or nature of their disabilities; to make available to each resident an individual and independent advocate; to enjoin the use of "Do Not Resuscitate" orders ("DNR orders") until procedures are developed and implemented which assure that such orders will not be issued in error; and to require the defendants to develop a plan to remediate environmental and program deficiencies. (Pls.' Third Am.Compl. at 29–31.)

STS and DMR jointly moved to dismiss the action for failure to state a claim upon which relief may be granted in February 1996. In denying the motion, the Court first held that *United States v. Connecticut* did not preclude the plaintiffs' suit. Next, the Court concluded that plaintiffs properly alleged claims based on due process, the ADA, and Section 504. Finally, the Court decided that plaintiffs could sue under 42 U.S.C. § 1983 for a violation of the Social Security Act. *See* Ruling on Mot. to Dismiss by Defs. STS and DMR. In that same year, the Court rejected a similar joint motion to dismiss by DPH and DSS. In so doing, the Court made two additional rulings. First, DPH could be liable for a substantive due process violation because its inaction may have contributed to plaintiffs' harm. Second, plaintiffs stated a claim for a procedural due process violation based on their allegation that DNR orders were imposed as a matter of course. *See* Ruling on Mot. to Dismiss by Defs. DPH and DSS.

In March 1996, seven STS residents, the Home and School Association of Southbury Training School, Inc. ("HSA"), and the Southbury Training School Foundation, Inc. ("STSF") moved to intervene on the side of the defendants pursuant to Federal Rule of Civil Procedure 24. The applicants argued that their interests would be impaired if they were not allowed to intervene because this case might result in the closure of STS or they might be forced into community placements. Although the Court denied this motion, it attempted to allay these concerns by narrowing the type of relief that plaintiffs could seek in this case. The Court found that "plaintiffs' complaint must be read as seeking to require STS [merely] to *consider* whether each resident is appropriate for community placement and to then act accordingly based upon such consideration." Rul-

---

1. The defendants are involved in similar litigation relating to STS. In a companion case brought in 1986, the United States Department of Justice sued the State of Connecticut under the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997 *et seq.* (1997) to remedy unconstitutional conditions at STS. The two parties negotiated a Consent Decree providing for a comprehensive remedial plan to ameliorate conditions at the institution. This Court approved the Consent Decree on December 22, 1986. *See United States v. Connecticut,* No. N–86–252 (EBB) (D.Conn. Dec. 22, 1986) (Order Approving Consent Decree).

In 1990 and 1991, the Court approved two additional Consent Orders, which were negotiated in response to continuing deficiencies in the care and treatment of STS residents. When more deficiencies were discovered in 1993, the Court ruled the State in contempt of its prior orders. To correct the problem, the Court appointed a special master to evaluate the State's compliance and oversee the implementation of a remedial plan. The special master's role continues at the present time.

ing on Mot. to Intervene at 3–4. Thus, plaintiffs cannot obtain the following relief: (1) the ending of all new admissions to STS; (2) the transferring of all residents to community settings; and (3) the closure of STS.

Soon thereafter, the Court certified the plaintiff class under Federal Rule of Civil Procedure 23(b)(2) as including all current STS residents, those persons who may be placed at STS in the future, and those persons who were transferred from STS and remain under the custody and control of the Director of STS. *See* Ruling on Mot. for Class Certification at 1. In addition, the Court reaffirmed three propositions relevant to this ruling. First, plaintiffs are adept representatives of all class members' interests in improving conditions and services at STS in accordance with constitutional safeguards. Second, plaintiffs have not stated any legal theory upon which the Court could possibly order the closure of STS. Finally, plaintiffs' requested relief would in no way usurp or infringe upon any legally protectable rights of guardians of STS residents under state law. *See id.* at 14.

In June 1997, HSA and STSF moved for exclusion from the class on behalf of the same seven class members who unsuccessfully attempted to intervene. Once again, the Court denied the motion and addressed the applicants' concerns regarding the potential outcome of this case by reiterating that

> [T]he most that plaintiffs can accomplish is to require Southbury to conform with its constitutional duty to consider the appropriateness of community placement for each resident. In no way can the plaintiffs force Southbury to place in community settings those residents for whom community placement is inappropriate, or force

the state of Connecticut to shut down Southbury.

Ruling and Order Regarding Application for Exclusion from Class at 2.

In the pending motion before the Court, 611 STS residents and their respective guardians seek to opt out of the plaintiff class, or in the alternative be made a separate subclass, and intervene on the side of the defendants.[2] Movants contend that a strong conflict exists between the named plaintiffs, who advocate community placement and the closure of STS, and the guardians of the 611 STS residents, who vehemently oppose community placement. In addition, movants disagree with many of the allegations in plaintiffs' complaint regarding conditions at STS.[3] Finally, movants claim that this case threatens their rights as guardians to make choices concerning their wards' care. Despite acknowledging that the Court's prior rulings preclude the closure of STS in this case, movants insist that an unfavorable outcome will affect the broader political and social issues surrounding community placement beyond the Court's control. Accordingly, movants argue that they should be allowed to protect these interests by opting out and intervening on the side of the defendants.

## DISCUSSION

### I. Class Action Requirements

Federal Rule of Civil Procedure 23(a) provides that district courts may certify class actions only when the following prerequisites are fulfilled: (1) the class is so numerous as to make joinder impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties typify those of the class; and (4)

---

2. In total, movants represent approximately 85% of the plaintiff class (611 out of 724 STS residents signed the petition to opt out).

3. The Court notes that movants' claims regarding conditions at STS has shifted throughout this case. When HSA, STSF, and seven STS residents moved to intervene in February 1996, they included a cross-complaint against DMR and STS. (Mem. in Supp. of Mot. to Intervene at 5.) The cross-complaint alleged that DMR and STS violated the residents' due process rights by maintaining inadequate staffing, medical and

nursing care, psychiatric and psychological treatment, social work services, physical and occupational therapy services, speech pathology and audiology services, vocational and rehabilitation training, and recreation services. (Proposed Cross–Complaint Against DMR and STS.) Furthermore, the proposed intervenors charged that the defendants failed to provide STS residents with "minimal, professionally acceptable levels of active programming or habilitation or protection from harm." (*Id.*)

the representative parties will fairly and adequately protect the interests of the class. In addition, an action must satisfy one of three provisions contained in Rule 23(b) in order to be certified as a class action. All members of a class will be bound by the judgment rendered in a class action, except those parties allowed to opt out.

Rule 23(b) creates three distinct categories of class actions: the (b)(1) action, the (b)(2) action, and the (b)(3) action. The three categories are not mutually exclusive, and a class may be certified under more than one category. *See* 5 James Wm. Moore et al., *Moore's Federal Practice* ¶ 23.31[2], at 23-235 (3d ed.1998). This case was certified as a class action under Rule 23(b)(2). This provision allows class actions when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R.Civ.P. 23(b)(2).[4]

## II. *Opting Out of Rule 23(b)(2) Class Actions*

### A. Right to Opt Out Under Rule 23 and Due Process

Important procedural distinctions exist between the (b)(1) and (b)(2) actions and the (b)(3) action. Class members possess an absolute right to opt out of a(b)(3) action. *See* Fed.R.Civ.P. 23(c)(2). However, Rule 23 does not explicitly provide a similar right to class members in (b)(1) or (b)(2) actions. As a result, most courts hold that Rule 23 does not offer class members an absolute right to opt out of a(b)(1) or (b)(2) suit. *See, e.g., County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1303 (2d Cir.1990); *In re A.H. Robins Co.,* 880 F.2d 709, 728 (4th

Cir.1989); *In re Dennis Greenman Sec. Litig.,* 829 F.2d 1539, 1544 (11th Cir.1987).

Although Rule 23 does not provide an absolute right to opt out of a(b)(1) or (b)(2) action, the Supreme Court holds that in cases "wholly or predominantly for money judgments," due process requires that absent plaintiffs receive notice and an opportunity to opt out, even in actions certified under (b)(1) or (b)(2). *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). This clearly covers securities fraud and antitrust class actions because these cases primarily concern damages. However, the Court has remained silent concerning whether (b)(1) and (b)(2) class members possess a due process right to opt out of suits not predominantly for monetary judgments such as Title VII "hybrid" actions involving back pay and injunctive relief or suits merely seeking an injunction or a declaratory judgment. *See infra* Part II.D.

### B. Discretion to Grant Opt–Outs in (b)(2) Actions

██ The Second Circuit and several other circuits recognize that district courts have discretion to permit opt-outs in (b)(1) and (b)(2) actions not predominantly for damages in proper circumstances. *See County of Suffolk,* 907 F.2d at 1302 (declaring that "Rule 23 does authorize a district court to allow a class member to opt out of a Rule 23(b)(1)(B) class action under some circumstances"); *Eubanks v. Billington,* 110 F.3d 87, 94 (D.C.Cir.1997) (holding that "the language of Rule 23 is sufficiently flexible to afford district courts discretion to grant opt-out rights in (b)(1) and (b)(2) class actions"); *Crawford v. Honig,* 37 F.3d 485, 487 n. 2 (9th Cir.1994) (same); *Williams v. Burlington N., Inc.,* 832 F.2d 100, 103 (7th Cir.1987) (same); *Penson v. Terminal Transp. Co.,* 634 F.2d 989, 994 (5th Cir.1981) (same). Commentators also

---

**4.** Rule 23(b)(1) allows class actions when "the prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members

not parties to the adjudications or substantially impair or impede their ability to protect their interests."

Rule 23(b)(3) allows class actions when "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy...."

adhere to the position that courts may allow opt-outs in (b)(1) and (b)(2) actions using sound discretion. *See* Moore, *supra*, ¶ 23.40[4], at 23–283; 3 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 16.17, at 16–91 to 16–94 (3d ed.1992).

The authority to grant exclusion in (b)(1) and (b)(2) suits arises under Rule 23(d)(5). *See County of Suffolk*, 907 F.2d at 1304. Rule 23(d) provides district courts with the means to facilitate "the fair and efficient conduct of the action." Fed.R.Civ.P. 23(d) Advisory Committee's Note to the 1966 Amendments. The rule states in relevant part:

> Orders in Conduct of Actions. In the conduct of actions to which this rule applies, the court may make appropriate orders: (1) determining the course of proceedings or prescribing measures to prevent undue repetition or complication in the presentation of evidence or argument; (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action; (3) imposing conditions on the representative parties or on intervenors; (4) requiring that the pleadings be amended to eliminate therefrom allegations as to representation of absent persons, and that the action proceed accordingly; (5) dealing with similar procedural matters.

Fed.R.Civ.P. 23(d). In *County of Suffolk*, the Second Circuit held that subsection (d)(5), which empowers courts to deal with similar procedural matters as those set out in (d)(1)–(4), provided ample authority for a district court's decision to allow class members to opt out of a "limited fund" class action brought under Rule 23(b)(1)(B). *See* 907 F.2d at 1304.

### C. Standard of Review

 The Second Circuit reviews decisions to grant or deny opt-out rights in (b)(1) and (b)(2) actions for an abuse of discretion. *See id.* at 1305; *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1160 (11th Cir.1983); *Hervey v. City of Little Rock*, 787 F.2d 1223, 1227 (8th Cir.1986); *Eubanks*, 110 F.3d at 96–97. Under an abuse of discretion standard, trial courts must permit class members to opt out of a(b)(1) or (b)(2) suit when it is "necessary to facilitate the fair and efficient conduct of the litigation." *Eubanks*, 110 F.3d at 96–97; *County of Suffolk*, 907 F.2d at 1305. This formulation requires courts to accord opt-out rights only when necessary to promote the values of fairness and efficiency.

### D. Opting Out of (b)(2) Suits for Injunctive Relief

While the Supreme Court held in *Shutts* that the right to opt out exists in cases wholly or predominantly for money damages, the Court failed to address whether due process requires absent plaintiffs to receive notice and an opportunity to opt out in (b)(1) and (b)(2) suits not predominantly for money damages. *See* 472 U.S. at 811 n. 3, 105 S.Ct. 2965 (expressing no opinion as to "other types of class actions such as those seeking equitable relief"); Maximilian A. Grant, *The Right Not to Sue: A First Amendment Rationale for Opting Out of Mandatory Class Actions*, 63 U.Chi.L.Rev. 239, 245 (1996) (maintaining that *Shutts* does not govern Title VII(b)(2) actions). Thus, the task has fallen to lower courts to decide when, if ever, courts should grant exclusion from (b)(2) actions that do not focus primarily on damages.

Most courts granting exclusions in these types of (b)(2) suits have done so in "hybrid" cases where plaintiffs seek both monetary and equitable relief. *See, e.g., Eubanks*, 110 F.3d at 94–96; *Holmes*, 706 F.2d at 1148–52; *Allen v. Isaac*, 100 F.R.D. 373, 376 (N.D.Ill. 1983). Hybrid cases typically involve employment discrimination claims where the class requests back pay in addition to an injunction. When a Title VII(b)(2) suit reaches the damages phase, the potential for conflicts among class members increases because back pay claims may be uniquely individual to each class member. *See Holmes*, 706 F.2d at 1159. At this stage "conflicts of

interest may emerge, and the assumptions of homogeneity and class cohesiveness that· underlie (b)(2) certification can begin to break down." *Eubanks,* 110 F.3d at 94; *see also Allen,* 100 F.R.D. at 376 (declaring that "[a]lthough back pay claims properly are characterized as equitable relief within the ambit of 23(b)(2) ... the monetary relief aspect of a back pay claim arguably draws the class members into antagonistic positions"). In fact, a Title VII(b)(2) action may resemble a(b)(3) action when it reaches the monetary phase. *See Eubanks,* 110 F.3d at 94.

In this case, the plaintiffs only seek an injunction to order the defendants to consider all STS residents for community placement and to have STS professionals make these decisions in conjunction with each resident and his or her respective guardian. Plaintiffs do not seek damages; therefore, this case cannot be characterized as a hybrid action. Few cases have dealt with situations where (b)(2) class members sought exclusion from an action solely for injunctive relief. One case, however, proves instructive for resolving movants' request to opt out.

*Wyatt v. Poundstone,* 169 F.R.D. 155 (M.D.Ala.1995) presents a strikingly similar set of facts to this case where mentally ill and mentally retarded residents of state facilities brought a(b)(2) action, alleging that state officials violated a prior consent decree, due process, and the ADA. Defendants moved for decertification, arguing that a conflict of interest existed within the plaintiff class—class members were divided between those who advocated community placement of residents and those who opposed it. *See id.* at 160. The Middle District of Alabama held that this conflict did not warrant class decertification for two reasons. *See id.* at 160–62.

First, the court concluded that "any conflict within the plaintiff class may have resulted at least in large part from misinformation disseminated by the defendants." *Id.* at 160. The defendants had sent letters to class members, their guardians, caregivers, and next-of-kin informing them that the plaintiffs and their attorneys were seeking to have services for all class members reduced and full deinstitutionalization of the mentally retarded by moving them into the community. The court recognized that defendants' letter failed to state that plaintiffs merely sought to require defendants to develop more extensive community services and to offer institutionalized residents a choice between institutionalization and community placement. *See id.* As a result, it would be "manifestly unjust" and illogical to decertify the class when defendants may have caused the antagonism through misinformation. *Id.* at 161.

Second, the court found that, although some plaintiffs correctly informed still may disagree with community placement, this did not necessarily warrant decertification. *See id.* It reasoned that the crucial issue concerned whether the class as a whole was being adequately represented by the existing parties. In this regard, the court held that the disenchanted plaintiffs' position against community placement was being adequately represented by the state defendants, who were vigorously litigating the same position in the case. *See id.* at 162. So long as the dissenters were receiving adequate representation, there could be no violation of due process in denying decertification of the class.[5]

■ Three policies support this Court's refusal to allow movants to opt out of this (b)(2) action solely for injunctive relief. First, ordering opt-outs could be counterproductive in a suit for declaratory or injunctive relief. "The fact that some class members may be satisfied with the challenged activity is irrelevant when relief would be beneficial

---

5. The Court notes that one district court has taken the opposite view. The Eastern District of Arkansas faced a similar situation in *Baldridge v. Clinton,* 139 F.R.D. 119 (E.D.Ark.1991). In that case, an association representing more than 900 parents and guardians of disabled ·residents moved to intervene, contending that they opposed the claims and objectives of the plaintiff class. *See id.* at 123. As in the present suit, the proposed intervenors supported their motion with a survey indicating their opposition. In the wake of this motion, the court granted defendants' petition to decertify the class, holding that the disenchanted plaintiffs' opposition had destroyed the prerequisites of Rule 23(a). *See id.* at 128. For several reasons, *Wyatt v. Poundstone* represents the better view.

to all members of the class." Newberg & Conte, *supra,* § 16.17, at 16–95. In *Moss v. Lane Co.,* the district court addressed this policy by stating in relevant part:

> I am not convinced of the "displeasure" of the other members of the class with the present suit. If plaintiff's allegations are true, an injunction may issue requiring an end to the discriminatory practices. Such relief would be beneficial to all members of the class.... By such dismissal, I would be saying that either there is no racial discrimination practiced by the defendant against the other members of the class or that the other Negro employees want to be racially discriminated against. Clearly the latter is unacceptable, and, certainly, the former would be an improper determination at this stage of the suit.

50 F.R.D. 122, 125–26 (W.D.Va.1970), *aff'd,* 471 F.2d 853 (4th Cir.1973).

Several courts have held that diversity of opinion within a class does not automatically defeat class certification. *See, e.g., Lanner v. Wimmer,* 662 F.2d 1349, 1357 (10th Cir.1981) (maintaining that "it is not fatal if some members of the class might prefer not to have violations of their rights remedied"); *Wilder v. Bernstein,* 499 F.Supp. 980, 993 (S.D.N.Y.1980) (holding that the "fact that some members of the class may be satisfied with the existing system and may prefer to leave the violation of their rights unremedied is simply not dispositive of a determination under Rule 23(a)"); *Waters v. Barry,* 711 F.Supp. 1125, 1131–32 (D.D.C.1989) (concluding that diversity of opinion within a(b)(2) class with regard to the constitutionality of a curfew law did not prevent certification); *United States Fidelity & Guaranty Corp. v. Lord,* 585 F.2d 860, 873 (8th Cir.1978) (same). Although these decisions came in the context of class certification, the principle applies to a motion to opt out with equal force.

Second, a (b)(2) class may include future members who stand to benefit from a favorable outcome in the case. These future members' interests cannot be overlooked when faced with a motion to opt out that could potentially destroy the numerosity requirement of Rule 23(a)(1). Class actions

under Rule 23(b)(2) "are useful and effective tools for the final determination of broad disputes concerning alleged discrimination." *Paddison v. Fidelity Bank,* 60 F.R.D. 695, 699–700 (E.D.Pa.1973). If courts allow class members to opt out, Rule 23(b)(2)'s purpose of resolving whether a policy and practice of discrimination exists would be defeated. *See id.* (reasoning that "the existence of a policy of discrimination is one that demands a mechanism for final resolution in our society"). Without a final resolution in this case concerning whether the defendants are discriminating impermissibly against STS residents, the future class members' interests might suffer.

Finally, opting out of a(b)(2) action for injunctive relief has little practical value or effect. *See Holmes,* 706 F.2d at 1157. Even class members who opted out could not avoid the effects of the judgment. *See Horton v. Goose Creek Ind. Sch. Dist.,* 690 F.2d 470, 487 n. 32 (5th Cir.1982) (reasoning that "the stare decisis effect of our decision that the sniffing procedures as they relate to the students are unconstitutional will, as a practical matter, put an end to all searches"); *Rosado v. Wyman,* 322 F.Supp. 1173, 1194 (E.D.N.Y.) (same), *aff'd,* 437 F.2d 619 (2d Cir.1970). A(b)(2) injunction would enjoin all illegal action, and all class members would necessarily be bound by its res judicata effect. *See Holmes,* 706 F.2d at 1157; *Horton,* 690 F.2d at 487 n. 32; *Paddison,* 60 F.R.D. at 696.

### III. *Movants' Request to Opt Out*

Movants make several claims in support of their bid to opt out which may be summarized as follows. First, movants contend that they oppose the named plaintiffs' goals in this suit and in the future, and also disagree with many of the allegations in the complaint concerning conditions at STS. While the plaintiffs seek the eventual closure of the institution and placement of residents in the community, movants prefer to remain at STS. (Request to Opt Out of Class ¶¶ 1, 5–8.) Second, movants argue that this case threatens their rights as individuals and guardians to be the primary decision makers regarding the services and supports they re-

ceive under the Developmental Disability Assistance and Bill of Rights Act ("DDA"), 42 U.S.C. § 6000(c)(3) (1997). (*Id.* ¶¶ 1, 8.) Finally, even though movants acknowledge that the Court has foreclosed the possibility that it will close STS or force residents into the community, they claim that an unfavorable result in this case could lead to a diversion of state resources away from STS and an ideological shift of opinion in the legislature. (Reply Mem. in Supp. of Mot. to Opt Out of Class at 6–8; Bondy Reply Aff. in Supp. of Mot. to Opt Out of Class ¶¶ 16, 18, 20.)

As stated earlier, the proper test concerns whether the grant of movants' request to opt out is necessary to facilitate the fair and efficient conduct of the litigation. With the values of fairness and efficiency in mind, the Court now turns to the merits of the request.

## A. Proof of Federal Violations Will Benefit the Class

Throughout this case, the parties have been litigating the rights of mentally retarded individuals who may otherwise have difficulty protecting their own interests. This case was brought on behalf of the present and future residents of STS, and this motion has been filed on behalf of 611 of those residents. Under the circumstances, an independent evaluation must be made regarding whether an award of opt-out rights will serve the STS residents' best interests. Clearly, the best interests of the STS residents demand that movants' request be denied.

The entire purpose behind Rule 23(b)(2) is to resolve disputes concerning the existence of a policy and practice of discrimination against a broad class of individuals. *See Paddison,* 60 F.R.D. at 699–700. Plaintiffs charge the defendants with violating due process, the ADA, Section 504, and 42 U.S.C. § 1983 for: (1) refusing to allow STS professionals, in conjunction with STS residents and their guardians, to develop and implement an individualized treatment plan appropriate for each resident; (2) failing to consider community placement as an option for many STS residents; (3) maintaining unconstitutional conditions at STS; and (4) failing to comply with federal funding requirements.

Indeed, due process requires that a decision to keep a resident in an institution rather than a community setting must be a "rational decision based on professional judgment." *Society for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239, 1249 (2d Cir.1984) (applying the Supreme Court's professional judgment standard in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) to community placement issues); *Hughes ex rel. David v. Cuomo,* 862 F.Supp. 34, 37 (W.D.N.Y.1994); *Astorino v. Lensink,* 1993 WL 366513, at *11 (D.Conn. Aug. 24, 1993). In addition, the ADA and Section 504 require defendants to refrain from discriminating against STS residents on the basis of the severity of their disabilities with respect to community placement. *See Martin v. Voinovich,* 840 F.Supp. 1175, 1191–92 (S.D.Ohio 1993) (concluding that Section 504 and the ADA prohibit discrimination on the basis of .severity of handicap); *Jackson v. Fort Stanton Hosp. & Training Sch.,* 757 F.Supp. 1243, 1299 (D.N.M.1990) (holding that the "severity of plaintiffs' handicaps is itself a handicap which, under § 504, cannot be the sole reason for denying plaintiffs access to community programs"), *rev'd on other grounds,* 964 F.2d 980 (10th Cir.1992); *Conner v. Branstad,* 839 F.Supp. 1346, 1356 (S.D.Iowa 1993) (same); 45 C.F.R. § 84.4(b)(1); 28 C.F.R. § 35.130.

If plaintiffs succeed in proving these violations, an injunction may issue requiring an end to the discriminatory practices. This relief would be beneficial to all members of the plaintiff class. *See Moss,* 50 F.R.D. at 125–26. The fact that some class members may be satisfied with the challenged activity is irrelevant when relief would be beneficial to all members of the class. *See* Newberg & Conte, *supra,* § 16.17, at 16–95; *Wyatt,* 169 F.R.D. at 161; *Waters,* 711 F.Supp. at 1131–32; *Wilder,* 499 F.Supp. at 993; *Lanner,* 662 F.2d at 1357; *United States Fidelity & Guaranty,* 585 F.2d at 873. Although movants are satisfied with the challenged activity in this case, exclusion remains unwarranted where a successful suit will not alter their rights or obligations under the law. *See Waters,* 711 F.Supp. at 1132.

The Court repeatedly has stated that plaintiffs cannot obtain: (1) the ending of all new admissions to STS; (2) the transferring of all residents to community settings; and (3) the closure of STS. *See* Ruling on Mot. to Intervene at 3–4; Ruling and Order Regarding Application for Exclusion from Class at 2. The most that plaintiffs can accomplish is to require STS to conform with its constitutional and statutory duty to *consider* the appropriateness of community placement. In no way can the plaintiffs force STS to place in community settings those for whom community placement is inappropriate. There can be little disagreement that having the right to choose between institutionalization and community placement will benefit movants and the other present and future members of the plaintiff class.

Movants' argument that the outcome of this case could effectuate the future closure of STS by changing the social and political landscape is unavailing. The Court must follow the law free from speculation as to the legislature's eventual reaction to the final result in this case. The operative question concerns whether the defendants violated federal law in their provision of services to STS residents, not whether a particular ideology favoring institutionalization or community placement should prevail in the legislative or executive branch.

## B. Adequacy of Representation of Movants' Interests

Courts possess an ongoing duty throughout all stages of class action litigation to ensure compliance with Rule 23(a). *See, e.g., General Tele. Co. v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *In re Asbestos Litig.,* 90 F.3d 963, 977 (5th Cir.1996); *Hervey v. City of Little Rock,* 787 F.2d 1223 (8th Cir.1986); *In re Gen. Motors Engine Interchange Litig.,* 594 F.2d 1106 (7th Cir.1979). Rule 23(a)(4) requires that class members be adequately represented in the litigation. Movants maintain that they cannot protect their interests as members of the plaintiff class. However, their position against community placement already is being adequately represented by the state defendants.[6]

■ The presence of conflicting views within a class does not require that dissenters be allowed to opt out where their positions are being adequately represented by the defendants in the litigation. *See Horton,* 690 F.2d at 487 (ruling that although some plaintiff class members approved of school drug searches in a case challenging their constitutionality, class certification remained appropriate where the dissenters' interests were aggressively represented by the defendant school district); *Dierks v. Thompson,* 414 F.2d 453, 457 (1st Cir.1969) (holding that although not all plaintiff class members agreed with every goal pursued by the named plaintiffs, class certification remained appropriate because the defendants in the litigation were adequately representing the dissenters' interests); *Wyatt,* 169 F.R.D. at 161–62; *Sturdevant v. Deer,* 73 F.R.D. 375 (E.D.Wis.1976); *Rota v. Brotherhood of Ry., Airline & S.S. Clerks,* 64 F.R.D. 699 (N.D.Ill. 1974).

In another type of case, the Court might hesitate to rely on the opponent of a class to represent the views of dissenting class members due to the danger of collusion. But in this case, the state defendants have presented an aggressive defense. "In such circumstances, the possibility of collusion is virtually nil, and we can rely on the defendant to present to the court the arguments supporting the contention of any dissident" STS resident. *Horton,* 690 F.2d at 487–88. Because movants' opposition to community placement is being litigated vigorously by the defendants and no danger of collusion exists, the Court concludes that movants' interests are being adequately represented as required by Rule 23(a)(4).

## C. Rights of Guardians and Individuals

Movants correctly assert that the guardians of STS residents play a heavy role in determining the course of their wards' care and treatment. In fact, state law requires all guardians to file an annual report with the

---

6. At the risk of repeating itself, the Court reminds movants that they may file *amicus curiae* briefs in connection with this case. *See* Ruling on Mot. to Intervene at 10.

Connecticut Probate Court describing their wards' care and progress. However, movants incorrectly propose that this case may hinder the guardians' rights to participate in the placement decision making process. Movants raised this same allegation in their 1996 motion to intervene, *see* Ruling on Mot. to Intervene at 5, and the Court rejects it for the same reasons as before.

Parents and guardians possess legal recourse under state law to prevent unwarranted community placement. *See* State of Connecticut Dep't of Mental Retardation, Admin. Directive No. 15 (Aug. 31, 1983). State law provides parents and guardians with notice and hearing rights in regard to proposed transfers of their children or wards. *See id.* The mere fact that this case may force STS to fulfill its constitutional obligation to make a rational decision based on professional judgment concerning the STS residents' future care in no way impairs parents' and guardians' ability to assert their legal rights as guaranteed by Connecticut law.

### D. Misinformation

As a collateral matter, some evidence suggests that the petition movants used to solicit support for this motion presented one-sided views regarding plaintiffs' objectives in this lawsuit. In their solicitation letter to the guardians of the 611 STS residents, HSA and STSF stated that plaintiffs' long-announced goal is to close STS or "force many STS residents into the community who do not wish to live there." (Bondy Aff. in Supp. of Mot. to Opt Out of Class, Ex. A ¶ 5; Ex. D at 2; Ex. E ¶ 2.) Additionally, the letter charges that "the organizations listed as plaintiffs ... wish to take away the rights of guardians." (*Id.*, Attach. D at 1–2; Ex. E. ¶ 2; Request to Opt Out of Class ¶ 1.) However, the letter does not refer to the Court's prior rulings foreclosing the possibility that STS will be closed in this case, nor does it disclose that the Court will not force STS residents to live in community settings. Nowhere does the letter state that plaintiffs only can require defendants to offer institutionalized residents a choice between STS and community placement, or that guardians have rights under state law to contest any such decisions.

Simply put, one-sided statements such as these do not constitute court-approved notice to the class as envisioned by Rule 23. Rule 23(d)(2) provides that district courts may issue notice "for the protection of the members of the class" offering an opportunity "to signify whether they consider the representation fair and adequate." This allows courts to ensure that communications to class members about their rights present an accurate representation of the facts. The Court will not speculate as to whether movants' one-sided communications with the guardians had an impact on their decision to support this motion. It suffices to note that the Court does not endorse such communications.

### IV. Subclasses and Intervention

As an alternative to opting out, movants propose that the Court designate them as a separate subclass pursuant to Rule 23(c)(4)(B). However, this would have the same effect as granting exclusion and subsequent intervention. Either way, the issues in this case would be complicated unnecessarily. In the exercise of its discretion, the Court declines to designate movants as a subclass for the same reasons that support the denial of their request to opt out. The Court also rejects any similar attempt by movants to intervene on the side of the defendants.

### CONCLUSION

For the above reasons, movants' motion to opt out, or be made a separate subclass, and to intervene as defendants [Doc. No. 333] is denied.

SO ORDERED.